682 F.2d 72
 110 L.R.R.M. (BNA) 2954, 94 Lab.Cas. P 13,630,
6 Collier Bankr.Cas.2d 937, 9 Bankr.Ct.Dec. 267,
Bankr. L. Rep. P 68,738
 In re BILDISCO, A General Partnership of the State of New Jersey,
Local 408, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America,
Appellant, No. 81-2140.
National Labor Relations Board, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner, No. 81-2238
v.
BILDISCO AND BILDISCO, Debtor-In-Possession, Respondent,
Local 408, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America, Intervenor.
 Nos. 81-2140, 81-2238.
 United States Court of Appeals,
Third Circuit.
 Argued March 19, 1982.
Decided June 17, 1982.
 
 Kenneth I. Nowak (argued), Zazzali & Kroll, Newark, N. J., for Local 408, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, appellant in No. 81-2140 and intervenor in No. 81-2238; Albert G. Kroll, Newark, N. J., of counsel.
 James Callear (argued), Margery E. Lieber, Deputy Asst. Gen. Counsel for Special Litigation; William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for National Labor Relations Board, petitioner in No. 81-2238 and intervenor in No. 81-2140.
 Jack M. Zackin (argued), Ravin, Katchen & Greenberg, P. A., Newark, N. J., for Bildisco and Bildisco, debtor-in-possession, appellee in No. 81-2140 and respondent in No. 81-2238.
 Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 In these consolidated proceedings we are required to accommodate the tension between two important aspects of our national policy, represented by the National Labor Relations Act and the Bankruptcy Reform Act of 1978. Specifically, we must decide whether the bankruptcy court erred in permitting a debtor-in-possession to reject a collective bargaining agreement as an executory contract. We also must consider the National Labor Relations Board's application for enforcement of its order determining that the same debtor-in-possession committed an unfair labor practice by unilaterally changing the terms of the agreement. We vacate the judgment in the appeal at No. 81-2140 and remand for further proceedings. Because the NLRB both erred in its choice and application of legal precepts and abused its discretion, however, we deny the application for enforcement at No. 81-2238.
 
 I.
 
 2
 Bildisco, a New Jersey partnership engaged in selling and distributing building supplies, filed a voluntary petition for reorganization on April 14, 1980, under Chapter 11 of the Bankruptcy Code. The bankruptcy court thereafter designated the partnership as a debtor-in-possession and authorized it to operate the business under 11 U.S.C. § 1107.[1]
 
 
 3
 Bildisco and Local 408 of the Teamsters Union were parties to a collective bargaining agreement that on the date of the petition covered eighteen of Bildisco's employees. On January 5, 1981, the debtor-in-possession sought bankruptcy court permission to reject the collective bargaining agreement under 11 U.S.C. § 365(a), which permits rejection of executory contracts upon bankruptcy court approval. The sole witness at the hearing on the motion was one of Bildisco's partners, Sal Valente, who testified that Bildisco's creditors were concerned about the "union situation" and that by operating without the collective bargaining agreement Bildisco would be able to save approximately $100,000 in 1981. Although eighteen of Bildisco's employees were covered by the collective bargaining agreement as of the date of the petition, by the date of the hearing the number had been reduced to three.[2] The union cross-examined Valente, but it did not offer any other evidence concerning the effect of rejection on Bildisco's employees.
 
 
 4
 The bankruptcy judge, without expressly articulating the standard that he applied,[3] granted permission to reject on January 15, 1981, retroactive to the date immediately preceding the date of the petition. See 11 U.S.C. § 365(g)(1). The union appealed to the district court, which on May 4, 1981, issued a bench opinion affirming the order of the bankruptcy court. Noting that the bankruptcy judge had not identified the test he had used, the district court held that the permission to reject was proper in any event.
 
 
 5
 In the meantime, the union had filed unfair labor practices charges with the NLRB complaining that Bildisco had refused to grant certain wage increases, to pay pension and welfare contributions, or to turn over union dues, all in violation of the collective bargaining agreement. After investigating the charges, the General Counsel of the NLRB issued a complaint on July 31, 1980, alleging that Bildisco, and Bildisco as debtor-in-possession, had engaged in unfair labor practices in violation of sections 8(a)(1) and (5) of the National Labor Relations Act by making unilateral changes in the collective bargaining agreement. The complaint advised Bildisco that a hearing had been scheduled for March 9, 1981, more than seven months later, and that if Bildisco did not answer the complaint within ten days of service, all of the allegations would be deemed admitted. On September 24, 1980, a Board agent advised Valente of the company's obligation to answer the complaint. On October 8, the General Counsel issued an amended complaint reflecting additional union allegations that the company had failed to pay vacation benefits to its employees. On October 27, 1980, a Board attorney informed Valente by telephone and by letter that he would seek summary judgment if no answer to the amended complaint were received by October 31. No answer was filed.
 
 
 6
 On January 27, 1981, twelve days after the bankruptcy court authorized rejection of the collective bargaining agreement, the Board's General Counsel moved for summary judgment based on Bildisco's failure to answer the amended complaint. Two days later Bildisco responded with a request for a 60-day stay of proceedings so that it could apply for bankruptcy court permission to retain special labor counsel. The General Counsel opposed this request.
 
 
 7
 On February 9, 1981, the Board issued a notice to show cause why summary judgment should not be granted. Bildisco responded on February 20 that its delay in filing an answer was caused by the disruption of Chapter 11 proceedings and that it had not yet received bankruptcy court permission to retain special labor counsel.[4] It also informed the Board that the bankruptcy court had granted its motion for permission to reject the collective bargaining agreement. Noting the retroactive effect of the rejection, the debtor-in-possession argued that no contract existed between it and the union after April 14, 1980. It argued also that any unpaid contributions due prior to the petition did not constitute unilateral changes in the contract, but were claims subject to allowance in Bildisco's Chapter 11 proceeding.
 
 
 8
 On April 23, 1981, stating that Bildisco had not shown good cause for failing to file a timely answer, the Board granted the General Counsel's motion for summary judgment, notwithstanding its notification two months earlier that the bankruptcy court had permitted Bildisco to reject the agreement. The order, addressed to "Bildisco and Bildisco, debtor-in-possession," required Bildisco to make all the delinquent contributions and payments plus interest, to honor the terms of the collective bargaining agreement, and to post appropriate notices. The NLRB made a "finding of fact" that the debtor-in-possession "is, and has been at all times material herein since April 17, 1980, an alter ego in bankruptcy to Bildisco." App. at 131.[5] The Board subsequently applied to this court for enforcement of its order.
 
 
 9
 We granted the Board's motion to consolidate the two cases. The Board has intervened in the union's appeal from the district court order, and the union has intervened in the Board's application for enforcement. We will consider the appeal and the application for enforcement in turn.
 
 II.
 
 10
 The rejection of a collective bargaining agreement under the new Bankruptcy Code, which implicates a significant confrontation of labor and bankruptcy policies, is a matter of first impression in the courts of appeals. Nevertheless, we have the benefit of both statutory direction and the decisions of other courts interpreting the equivalent section of the former Bankruptcy Act and the relevant provisions of the NLRA.
 
 A.
 
 11
 Underlying Chapter 11 of the Code is a legislative policy to provide opportunities for a debtor to reduce or extend debts so that it can return to financial viability.
 
 
 12
 The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long-term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.
 
 
 13
 H.R.Rep.No. 595, 95th Cong., 1st Sess. 220 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6179. If a business can be turned around by reorganization, its creditors will recover more on their claims than in a Chapter 7 liquidation,[6] its employees will keep their jobs, and the public will continue to benefit from its production. Thus the debtor, its creditors and employees, and the public at large benefit from the business' survival. Under the congressional schema, this goal is promoted by numerous specific mechanisms, including continued operation in the hands of the debtor-in-possession or trustee, under supervision of the court, with a "breathing spell" free from the collections efforts of creditors. Another mechanism is to allow the debtor-in-possession to reject executory contracts that would burden the estate. See 2 Collier on Bankruptcy PP 365.01-.03 (15th ed. 1981). See generally Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523, 549-51, 63 S.Ct. 727, 742-43, 87 L.Ed. 959 (1943); Sparhawk v. Yerkes, 142 U.S. 1, 13, 12 S.Ct. 104, 106, 35 L.Ed. 915 (1891); In re Italian Cook Oil Corp., 190 F.2d 994 (3d Cir. 1951).
 
 
 14
 Section 365(a) of the Code provides, with exceptions not now relevant, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."[7] Under Chapter 11 a debtor-in-possession has essentially the same powers as a trustee,[8] and it therefore may reject executory contracts with the authorization of the bankruptcy court.
 
 B.
 
 15
 This case places the statutory policies underlying Chapter 11 in tension with our national labor policy, as expressed in the National Labor Relations Act. Broadly stated, that policy is to promote industrial peace by facilitating collective bargaining. Sections 7 and 8 of the NLRA, 29 U.S.C. §§ 157 and 158, guarantee the rights of workers to organize and to bargain collectively and protect both employees and employers from unfair labor practices that undermine these rights.
 
 
 16
 The specific statute relied on by the union and the Labor Board is § 8(d) of the NLRA, which provides that no party to a collective bargaining agreement may "terminate or modify" the agreement without following a specified procedure.[9] Our task is to reconcile the apparent conflict between the NLRA and the Bankruptcy Code and the policies they represent.
 
 III.
 
 17
 In enacting § 365, Congress provided no indication that collective bargaining agreements were to be immune from rejection and thus unique among executory contracts. Indeed, the few inferences of congressional intent that may be gleaned from the Code and its legislative history are to the contrary. First, notwithstanding several judicial decisions holding collective bargaining agreements susceptible to rejection.[10] Congress afforded collective bargaining agreements no special treatment. Significantly, Congress did provide detailed provisions for acceptance of executory contracts such as shopping center leases, § 365(b)(3), and regarding transactions in commodities futures contracts, §§ 765, 766. Moreover, one particular species of collective bargaining agreement was singled out:
 
 
 18
 Notwithstanding section 365 of this title, neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act (45 U.S.C. 151 et seq.) except in accordance with section 6 of such Act (45 U.S.C. 156).
 
 
 19
 11 U.S.C. § 1167. The sheer complexity of the Bankruptcy Reform Act might preclude our use of § 1167 as definitive proof that every other collective bargaining agreement may be rejected, but the section permits an inference that, with this one exception, Congress did not intend to distinguish collective bargaining agreements from executory contracts in general.
 
 IV.
 
 20
 Having determined that § 365(a) authorizes the bankruptcy court to permit the rejection of collective bargaining agreements, we now turn to the standards it should use in considering such a request. We begin by rejecting the concept that the proceeding under § 8(d) of the NLRA is mandated. As more fully developed in Part VI-A, infra, a debtor-in-possession is a new entity, separate and apart from the prebankruptcy company, and does not become a party to an executory contract unless it assumes the contract. Bildisco, as a debtor-in-possession, was not a party to the collective bargaining agreement, and therefore not bound by § 8(d). Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc., 519 F.2d 698, 704 (2d Cir. 1975). The burden of persuading the bankruptcy court to permit rejection of a collective bargaining agreement must be placed on the moving party: the debtor-in-possession or the trustee. Our critical task is to establish the extent of that burden.
 
 A.
 
 21
 The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the "business judgment" test. See 2 Collier on Bankruptcy P 365.03 (15th ed. 1981). The impact of rejection of a collective bargaining agreement on the rights of workers and the favored status those rights have been accorded by Congress, however, require a more stringent examination of the evidence offered to justify rejection of such a contract. The second circuit in Kevin Steel, speaking through Judge Feinberg, accommodated the interests of the workers by holding that rejection of a collective bargaining agreement requires " 'thorough scrutiny, and a careful balancing of the equities on both sides.' " 519 F.2d at 707 (quoting In re Overseas National Airways, Inc., 238 F.Supp. 359, 361 (E.D.N.Y.1965)).
 
 
 22
 We accept this formulation of the appropriate relationship between the competing statutory policies. It accommodates the statutory policies of the Labor Act by demanding a greater evidentiary showing than for rejection of a typical executory contract, but it does not erect impossible barriers to rejection of labor contracts in violation of the policies underlying Chapter 11. It plots a middle course between the possible extremes, requiring a sensitive weighing of the competing private and public interests in the context of the particular case.
 
 
 23
 We reject, however, the formulations of subsequent decisions pressed on us by the union and the Board, which purport to follow the rule of Kevin Steel but instead replace its "balancing of the equities" with a test predicating permission to reject on a showing "that an onerous and burdensome executory collective bargaining agreement will thwart efforts to save a failing carrier in bankruptcy from collapse." Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 169 (2d Cir.), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388; 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1975).[11] According to REA Express, rejection should be permitted "only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs." Id. at 172. The district court in this case and the court in In re Alan Wood Steel Co., 449 F.Supp. 165 (E.D.Pa.1978), appeal dismissed, 595 F.2d 1211, 1214 (3d Cir. 1979), apparently building on REA Express and In re Penn Fruit Co., 92 L.R.R.M. (BNA) 3548 (E.D.Pa.1976), declared that Kevin Steel required a two step analysis:
 
 
 24
 First, the court should determine that the agreement is onerous and burdensome to the estate, so that failure to reject will make a successful arrangement impossible. Second, the equities must be balanced and found to favor the debtor. Then, and only then, may rejection of a collective bargaining agreement be permitted.
 
 
 25
 449 F.Supp. at 169, quoted in district court op. at 4-5 (emphasis added).
 
 
 26
 The italicized portion of the first step, in our view, goes well beyond the "balancing of equities" required by Kevin Steel. We reject this more stringent test for two discrete but related reasons: first, for the pragmatic reason that it may be impossible to predict the success vel non of a reorganization until very late in the arrangement proceedings; and second, for the prudential consideration that the imposition of such a test unduly exalts the perpetuation of the collective bargaining agreement over the more pragmatic consideration of whether the employees will continue to have jobs at all.
 
 
 27
 At the date of oral argument in these proceedings, March 19, 1982, Bildisco was still operated by a debtor-in-possession under the supervision of the bankruptcy court. Thus almost two years after the petition for reorganization was filed and over a year after the court granted the debtor-in-possession permission to reject the agreement, there is still no assurance that Bildisco will successfully reorganize. We simply do not and cannot know whether it will be forced into liquidation. It is entirely unrealistic to require the bankruptcy court at an early stage of a reorganization proceeding to predict whether reorganization will be impossible absent rejection of the labor contract. In the common law tradition the acceptability or durability of a legal rule is directly dependent upon its utility. The rule urged upon us by the NLRB and the union appears to us deficient because we know of no formula readily available to a bankruptcy court in an early stage of a Chapter 11 reorganization that could reasonably predict whether a business reorganization will succeed.
 
 
 28
 We also reject the more stringent test because it could work to the detriment of the workers it seeks to protect. By erecting an excessive evidentiary barrier to rejection of labor contracts, the REA Express-Alan Wood Steel formulation would make it likely that numerous businesses attempting to reorganize will in fact be forced over the line into liquidation. Adherence to a collective bargaining agreement together with a successful reorganization is surely the best of possible worlds; but given the inevitable potential for conflict between these goals we think it preferable that jobs be preserved through rejection of a labor contract than that they be lost because of its acceptance.
 
 
 29
 In the multiplicity of fact situations that will arise, we think our best option is to require the bankruptcy courts to undertake a "thorough scrutiny, and a careful balancing of the equities on both sides" as set forth in Kevin Steel. Each case will present its own complexities. For example, the bankruptcy court must understand that the debtor-in-possession who rejects a collective bargaining agreement remains an employer and is still required by the NLRA to bargain with the representatives of its employees, Kevin Steel, 519 F.2d at 704, and that its employees retain their right to strike should negotiations fail, see In re Ryan Co., 83 Lab.Cas. (CCH) P 10,487 at 17,952 n.2 (D.Conn.1978). The consequences of a strike on a precarious business therefore must be one factor to be weighed by the bankruptcy court. Moreover, because under § 365(g) rejection constitutes a breach of contract, the employees may assert a claim for the value of the benefits lost. The court should consider both the impact of the resulting claim against the debtor and the adequacy of the relief employees might obtain through the claims procedures.[12]B.
 
 
 30
 We are satisfied that Kevin Steel, isolated from its illegitimate progeny, provides the appropriate framework for an intelligent and equitable approach to the problem because it gives collective bargaining agreements a measure of protection beyond that available under the business judgment test without unduly advancing the interests served by the Labor Act over the other interests of the employees and those of the debtor's other creditors. We believe that the debtor-in-possession must first demonstrate that the continuation of the collective bargaining agreement would be burdensome to the estate; that once this threshold determination has been made the debtor-in-possession must make a factual presentation sufficient to permit the bankruptcy court to weigh the competing equities; that the polestar is to do equity between claims which arise under the labor contract and other claims against the debtor; that, in this, the court must consider the rights of covered employees as supported by the national labor policy as well as the possible "sacrifices which other creditors are making" in the effort to bring about a successful reorganization, Group of Institutional Investors, 318 U.S. at 550, 63 S.Ct. at 742; and that the court must make a reasoned determination that rejection of the labor contract will assist the debtor-in-possession or the trustee to achieve a satisfactory reorganization. We believe that particularly in a time of economic uncertainty and distress an analysis following this pattern provides more protection to both employer and employee than the test urged upon us by the union and the NLRB.[13]
 
 V.
 
 31
 Having identified the considerations properly applicable to rejections of collective bargaining agreements, we turn to the appeal at No. 81-2140; and we begin by examining the arguments presented to the bankruptcy court. The union argued that the proper test was that articulated in REA Express and Alan Wood Steel : rejection is permissible only if reorganization otherwise would be impossible and if the equities favor the debtor. Counsel for the debtor-in-possession, on the other hand, submitted that collective bargaining agreements are to be treated like all other executory contracts and that rejection should be permitted whenever it would benefit the debtor.
 
 
 32
 The bankruptcy court's bench opinion unfortunately was a woefully inadequate treatment of a sophisticated subject. It is not clear whether the bankruptcy court chose one of the two standards proffered by the parties or applied a synthesis of the two.[14] Where the state of the law is settled there are three critical prerequisites to a determination of reversible error: (a) specific acts or omissions by the trial court constituting legal error, (b) properly suggested as error to the trial court, and (c), if uncorrected on that level, then properly presented for review to the appellate court. Assuming that the trial court erred, for there to be reversible error, we must be able to determine that appellant properly identified the error and requested the trial court to take a legally appropriate course of action. Pfeifer v. Jones & Laughlin Steel, 678 F.2d 453, 457 n.1 (3d Cir. 1982). In the district courts, Fed.R.Civ.P. 46 requires a party to "(make) known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor." This requirement affords an opportunity for error correction and avoidance in the trial court in various ways: It gives the adversary the opportunity either to avoid the challenged action or to present a reasoned defense of the trial court's action, and it provides the trial court with the alternatives of modifying its decision or of ordering a more fully developed record for review. It also challenges the court to articulate the grounds for its decision and thus facilitates appellate review.
 
 
 33
 Where the state of the law is not settled, and the court of the first instance has not set forth a reasoned elaboration for its decision, as here, an appellate court cannot determine what motivated the trial court's decision. It cannot properly determine whether there was a specific act or omission constituting legal error. Even though an appellate court can affirm on the basis of reasons different from those set forth by the trial court, Rhoads v. Ford Motor Co., 514 F.2d 931 (3d Cir. 1975), a reviewing court cannot properly perform its function until the parties are given the opportunity to prepare a record and the trial court the opportunity to apply in the first instance newly formulated precepts to the facts adduced. Because we have set forth in detail the appropriate precepts to apply in a hitherto unsettled area of the law, and because we do not have the benefit of an adequate explanation of the trial court's action, the preferable course is to remand the proceedings for reconsideration in light of the precepts we announce today. Accordingly, we vacate the judgment of the district court and remand to it with a direction that the cause be further remanded to the bankruptcy judge for reconsideration.
 
 VI.
 
 34
 We now turn to the Board's application at No. 81-2238 for the enforcement of its summary judgment determining that the debtor-in-possession had committed an unfair labor practice.
 
 
 35
 It must be emphasized that we are not faced with an application for enforcement of an NLRB order entered after reception of evidence by an administrative law judge and a review of the record by the Board. We have only an application for enforcement of summary judgment; our denial of enforcement does not preclude the Board from processing the charges through a full hearing, guided and governed by the bankruptcy court's determination on remand concerning the rejection of the collective bargaining agreement, and by the views which we have expressed in this opinion.
 
 A.
 
 36
 The basis of the unfair labor practice charges is an allegation that the debtor-in-possession unilaterally changed the terms of the collective bargaining agreement and thereby failed to bargain in good faith, in violation of sections 8(a)(1) and (5) of the NLRA. The Board's theory depends upon its contention that the debtor-in-possession is an alter ego of the debtor and thereby a party to the collective bargaining agreement. The Board's argument fails, however, because, as a matter of law, a debtor-in-possession is "(a) new entity ... created with its own rights and duties, subject to the supervision of the bankruptcy court." Kevin Steel, 519 F.2d at 704 (footnote omitted). A debtor-in-possession is given powers comparable to those of a trustee, and it is thus an officer of the court. 11 U.S.C. § 1107. As the House and Senate Reports explaining § 1107 emphasize:This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes.
 
 
 37
 H.R.Rep.No. 595, 95th Cong., 1st Sess. 404 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6360; S.Rep.No. 989, 95th Cong., 1st Sess. 116 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5902. The debtor-in-possession's position is analogous to that of a successor employer: it may be required to recognize and bargain with the union, but it is not a party to its predecessor's collective bargaining agreement unless it assumes that agreement. NLRB v. Burns Security Services, Inc., 406 U.S. 272, 284, 92 S.Ct. 1571, 1580, 32 L.Ed.2d 61 (1972); Kevin Steel, 519 F.2d at 704. Because Bildisco as debtor-in-possession is not a party to the agreement with Local 408, it had the ability to reject the agreement without following the procedures outlined in § 8(d). We suggest to the NLRB that, at least in matters within this judicial circuit, it cease operating under such a fundamental misconception of the law. Indeed, we believe that persisting in such a misconception-one that goes to the difference between the pre-bankruptcy company which was the signatory to the collective bargaining agreement and the succeeding debtor-in-possession-is so fundamental that this error in and of itself is sufficient reason to refuse to enforce a summary judgment so predicated.
 
 B.
 
 38
 The Board contends, however, that this court may not consider Bildisco's defenses to the unfair labor practice complaint because they were not urged before the Board in a timely manner. Section 10(e) of the NLRA, 29 U.S.C. § 160(e), provides that "(n)o objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances"; and the Supreme Court has consistently held that, in the absence of extraordinary circumstances, "the failure or neglect of a respondent to urge an objection in the Board's proceedings forecloses judicial consideration of the objection in enforcement proceedings." NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312 (1961). The Board contends that the debtor-in-possession's sole excuse for its failure to file an answer was the disruption in its operations caused by reorganization proceedings, and that this excuse would not come within § 10(e)' § "extraordinary circumstances" exception.
 
 
 39
 We hold that § 10(e) is inapplicable to this case because the objection was urged before the Board at a time when the Board could have taken meaningful notice of it. Inasmuch as the date of the hearing had not yet passed, the Board's draconian remedy was unwarranted. We have recently observed that
 
 
 40
 an administrative agency like the NLRB, burdened with an extremely heavy caseload, must necessarily rely upon compliance with procedural rules to function efficiently. As part of the process, reasonable time limitations must be set and observed. Nevertheless, there are instances where wooden and unreasoning insistence upon technical procedural rules results, not in the proper disposition of a cause, but in injustice. Failure to take remedial measures when such incidents occur constitutes an abuse of discretion.
 
 
 41
 Livingston Powdered Metal, Inc. v. NLRB, 669 F.2d 133, 137 (3d Cir. 1982). We recognize that the response to the complaint here was exceedingly tardy, more so than in Livingston or its companion case of Kessler Institute for Rehabilitation v. NLRB, 669 F.2d 138 (3d Cir. 1982). But in National Book Consolidators, Inc. v. NLRB, 672 F.2d 323 (3d Cir. 1982), we required the Board to "utilize a 'good cause' standard in determining whether to accept filing of an answer," explaining that " '(t)he purpose of the "good cause" standard ... is to ensure that the Board makes decisions on the merits despite technical and inadvertent noncompliance with procedural rules.' " Id. at 326 (quoting NLRB v. Zeno Table Co., 610 F.2d 567, 569 (9th Cir. 1979)).
 
 
 42
 We do not suggest that the mere fact that a debtor-in-possession is implicated in the proceedings is itself sufficient reason for a delay. But the drastic circumstances here, where a work force of eighteen union members had been reduced to three in a business intimately associated with the construction industry, one of the most distressed industries of the present recession, and where the pre-bankruptcy company had been in active reorganization by a debtor-in-possession for over a year, we believe that the Board was presented with a "good cause" for accepting an untimely response and proceeding to consider what appears to us to be a most persuasive argument on the merits.
 
 
 43
 The timetable is significant. The amended complaint was filed October 8, 1980, and set a March 9, 1981, hearing date. On February 20, 1981, responding to the Board's order to show cause, Bildisco notified the Board that the bankruptcy court had entered an order on January 15, 1981, granting its motion to reject the labor contract. We do not condone the failure of the debtor-in-possession to respond to the complaint, but we will not enforce a Board order that cavalierly refuses to recognize an outstanding federal court order directly relating to the proceedings before it. Because rejection related back to the day before the Chapter 11 petition was filed, 11 U.S.C. § 365(g)(1), no labor contract effectively existed between the union and the debtor-in-possession, subsequent to April 14, 1980. In its thirteen page decision and order dated April 23, 1981, however, the Board failed even to acknowledge, much less to consider the effect of, the bankruptcy court order permitting rejection.
 
 
 44
 The Board did not explain how, as an agency of the executive branch, it can ignore the order of a federal court. We perceive no excuse for this disregard. It is as much a departure from acceptable decision-making for the NLRB to decide a case within its competence without accommodating competing principles of bankruptcy law as it would be for a bankruptcy court to decide a labor contract issue without accommodating competing principles of our national labor policy. Whatever the debtor-in-possession's technical breach of the NLRB's procedural rules, it does not excuse the agency's refusal to recognize the existence of the outstanding bankruptcy court order and to give some explanation why that order would be irrelevant to its proceedings.
 
 
 45
 We therefore conclude, for all the foregoing reasons, that the NLRB both erred as a matter of law and misused its discretion in granting the motion for summary judgment. Because the summary judgment included pre-petition charges as well as those relating to activities subsequent to the filing of the bankruptcy petition, it will be for the NLRB in the first instance to separate the two types of charges at any subsequent proceeding. Where charges of unfair labor practices arise both before and after the date of a Chapter 11 petition, the rejection of a collective bargaining agreement would not affect the obligations of the employer under § 8(d) prior to the date of the petition. We agree with the Board that a monetary claim resulting from a Board order in such circumstances is governed by bankruptcy law and may be filed as the claim of a creditor in the bankruptcy court. See Reply Br. at 7.
 
 
 46
 It would seem, however, that the Board must await the determination of the bankruptcy court on remand before it may proceed to consider the post-petition charges. If under the precepts we announce today the bankruptcy judge again permits the rejection of the collective bargaining agreement, the Board will be bound by that determination, which would preclude any post-petition unfair labor practice arising from the rejected agreement.
 
 VII.
 
 47
 The judgment of the district court at No. 81-2140 will be vacated and the cause remanded to it with a direction of a further remand to the bankruptcy judge for reconsideration in light of the foregoing. The NLRB's application for enforcement at No. 81-2238 will be denied without prejudice, for the reasons hereinabove expressed.
 
 
 
 [1]
 A debtor-in-possession is the debtor, 11 U.S.C. § 1101(1), who is given many additional rights, powers, and duties to the estate, as set forth generally in § 1107:
 (a) Subject to any limitations on a trustee under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.
 
 
 [2]
 Valente estimated that Bildisco would be increasing the number of employees to ten as the off-season ended, and his projections of the savings that would be realized if the agreement were rejected are predicated on the costs of salaries and benefits to ten employees
 
 
 [3]
 The bankruptcy judge concluded his consideration of the standard to be applied as follows:
 I don't know under the Code what power the court has to disapprove an application to reject a contract, unless it can be shown it was a promiscuous act on the part of the debtor, and it was really a beneficial contract.
 It is surely not a beneficial contract if it costs him $132 a week, which is my own computation, more than he would have to pay if he didn't have the contract.
 Under the circumstances I am going to have to allow the motion of the debtor.
 App. at 62-63. Subsequently, the following dialogue took place:
 COUNSEL FOR THE UNION: Just for the record, your Honor, with respect to the ruling today, it is your position, your Honor-and correct me if I am wrong-the cases prior to the enactment of the Bankruptcy Code, those cases dealing with special considerations given collective bargaining are no longer applicable?
 ....
 THE COURT: All I am saying is this is not a case under the Bankruptcy Act; it is under the Bankruptcy Code.
 Under Section 365 I have to grant the motion to reject.
 App. at 64-65.
 
 
 [4]
 The bankruptcy court granted Bildisco this permission on April 16, 1981
 
 
 [5]
 The respondent filed a motion for reconsideration accompanied by an answer to the Board's complaint; the Board rejected the motion because it was postmarked two days after the deadline for such motions. See 29 C.F.R. § 102.48(d)(2)
 
 
 [6]
 Experience under the Bankruptcy Act demonstrated that creditors received larger portions of their claims from reorganization proceedings than from liquidations. According to tabulations taken from a sample of bankruptcy cases, priority creditors usually received full payment in a successful reorganization but realized less than one-third of the amount of their claims in a straight bankruptcy. Unsecured creditors realized only a median nineteen percent under one-payment plans and ten percent under deferred payment plans when the debtor went through reorganization, but in straight bankruptcies the median was only eight percent. D. Stanley & M. Girth, Bankruptcy: Problem, Process, Reform 129-30, 142-43 (1971)
 
 
 [7]
 The analogous provision of the Bankruptcy Act stated:
 Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter-
 (1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interests as the court may designate....
 Bankruptcy Act of 1898, § 313, 11 U.S.C. § 713 (1976) (repealed).
 
 
 [8]
 11 U.S.C. § 1107. Under certain circumstances the court may appoint a trustee to operate the business. 11 U.S.C. §§ 1104, 1108
 
 
 [9]
 Termination or modification of a collective bargaining agreement is permitted by § 8(d) only if the moving party
 (1) serves a written notice upon the other party to the contract ...;
 (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
 (3) notifies the Federal Mediation and Conciliation Service ... and ... any State or Territorial agency established to mediate and conciliate disputes within the State or Territory ...;
 (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later: ... (T)he duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.
 29 U.S.C. § 158(d).
 
 
 [10]
 See, e.g., Truck Drivers Local Union No. 807 v. Bohack Corp., 541 F.2d 312 (2d Cir. 1976); Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc., 523 F.2d 164 (2d Cir.), cert. denied, 423 U.S. 1017, 1073, 96 S.Ct. 451, 46 L.Ed.2d 388, 96 S.Ct. 855, 47 L.Ed.2d 82 (1975); Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc., 519 F.2d 698 (2d Cir. 1975); Local Joint Executive Board, AFL-CIO v. Hotel Circle, Inc., 419 F.Supp. 778 (S.D.Cal.1976), aff'd, 613 F.2d 210 (9th Cir. 1980)
 
 
 [11]
 They reflect a phenomenon that our distinguished, former colleague, the late William H. Hastie, called "trampling upon graves": adding a substantial gloss to a previously stated holding but improperly citing the former case as the authority for the new formulation. Of course, the development of the law often consists of adding gloss to previous cases, as Cardozo described it: "Given a mass of particulars, a congeries of judgments on related topics, the principle that unifies and rationalizes them has a tendency, and a legitimate one, to project and extend itself to new cases within the limits of its capacity to unify and rationalize." B. Cardozo, The Nature of the Judicial Process 31 (1921). But it is quite another thing to disguise an expansion of the law by pretending that the court is simply applying a previously stated rule of law
 
 
 [12]
 Among other factors bankruptcy courts might consider in balancing the equities are, for example, the proportion of the debtor's employees covered by the collective bargaining agreement, how those employees' wages and benefits compare to those of others in the industry, and the good or bad faith of the parties in dealing with the effect of the company's insolvency on its labor obligations. See Note, The Bankruptcy Law's Effect on Collective Bargaining Agreements, 81 Colum.L.Rev. 391, 401-03 (1981). The listing of these considerations is not intended to be all-inclusive
 
 
 [13]
 According to data supplied by the U.S. Department of Labor, as of February, 1982, 9.6 million Americans wanting to work were unable to find jobs. This constitutes 8.8% of the work force and an increase from 3.4% in January-March 1969, 4.6% in October 1973, and 5.7% in May-July 1979. Because Bildisco is involved in the building supply business, a business directly associated with the construction business, and the employees who are covered by the labor contract are warehousemen, drivers, mechanics, and outside field servicemen, it is significant that 18.1% of the nation's construction workers were unemployed compared with 12.5% of blue-collar workers in general. U.S. News & World Report, March 15, 1982, at 71-73. Under circumstances of a distressed economy, a bankruptcy court could properly consider that it would be in the interests of the workers in a bargaining unit to be afforded the opportunity to continue to work under less generous financial benefits than to insist upon an absolute payment of vacation benefits, pension, health and welfare benefits, and wage increases. In weighing the equities the court could well conclude that it is in the public interest for employees to work without the advantage of fringe benefits than not to work at all
 
 
 [14]
 The district court affirmed the bankruptcy court by determining that, applying either test, the contract was appropriately rejected. The district court's analysis need not detain us, however, because our role as a court of review is identical to that of the district court. Universal Minerals, Inc. v. C. A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)