## In re MAVERICK MINING CORPORATION, Debtor.

### Bankruptcy No. 7–83–01288.

United States Bankruptcy Court,
W.D. Virginia,
Abingdon Division.

Feb. 9, 1984.

Robert T. Copeland, Abingdon, Va., for debtor.

Gerald F. Sharp, Castlewood, Va., for District 28, United Mine Workers of America and Local Union 7025.

## MEMORANDUM OPINION AND ORDER

H. CLYDE PEARSON, Bankruptcy Judge.

The issue before the Court is the Debtor's motion to reject the contract entered into by the Debtor and the United Mine Workers of America ("UMWA").

Maverick Mining Corporation, the Debtor, has operated as a mining contractor for Harman Mining Company in Buchanan County, Virginia. Harman Mining, in addition to the Debtor, has a number of contracting mining companies, some of which are owned by the persons who are the owners of the Debtor herein, all of which are signatories to the National Bituminous Coal Wage Agreement of 1981 ("Contract"). The Debtor has been signatory since June of 1981 and was signatory to the predecessor agreement since 1967. The present agreement expires on September 30, 1984.

The Debtor's motion alleges that the terms and conditions of the present contract are onerous, burdensome, and prevent the Debtor from operating profitably as a mining contractor.

The evidence reflects that this Debtor suspended operations in February, 1983 and filed its petition in this Court on November 16, 1983. From tax returns filed as evidence, it appears that the Debtor is a subchapter-S U.S. Small Business Corporation

operation for tax purposes according to returns filed for the taxable years 1975 through 1982. The Debtor apparently commenced showing a loss for the taxable year 1977. For the taxable year 1977, the tax return shows a loss of $174,826.00. However, the return reflects compensation for the three owner-officers of $141,750.00.

For 1978, the return reflects a loss of $99,000.00, with officer-owner compensation of approximately $50,000.00. For 1979, the witness for the Debtor testified that the Debtor had a loss of $104,000.00 (although the tax return does not reflect a loss, but a taxable income of that amount), with officers' compensation of $103,576.00. The 1980 tax return reflects a loss of $163,000.00, with officers' compensation of $90,000.00. The 1981 tax return reflects a loss of $19,565.00, with officers' compensation of $13,200.00. The 1982 tax return reflects a loss of $138,000.00, with officers' compensation of $12,000.00. However, the gross receipts for 1982 was a mere $109,575.00. The evidence further reflects that from June, 1982 to February, 1983, the Debtor had a limited, minimal operation.

The Debtor's testimony reflected that Harman Mining contractors other than the Debtor, some of which are owned by the owners of the Debtor, have been operating regularly under the same contract agreement. The evidence was not clear as to the manner in which other contractors were operating, presumably on a profitable basis, while the Debtor claimed its operation under the agreement with UMWA was unprofitable. The evidence reflects that Harman Mining takes virtually all coal mined upon their lands at a uniform set price to all contractors. A difference in gross receipts from sales would be affected by the quality of coal mined, however. If Harman Mining rejected coal produced by a contractor, the tonnage rejected would be a loss. The witness for the Debtor attributed some portion of the poor performance to this condition. There was, however, no showing as to why the low quality may have accrued under the new contract terms.

The Debtor seeks to reject the executory contract with UMWA pursuant to 11 U.S.C. § 365. In so doing, the issue immediately confronting the Court is the standard by which the Court applies the rule of rejection of an executory contract under the Bankruptcy Reform Act of 1978 (Code) and the Congressional national policy incorporated in the National Labor Relations Act (N.L.R.A.), 29 U.S.C. §§ 157 and 158. Broadly stated, the policy enunciated by Congress to be the national policy in the field of labor-management is to promote industrial peace by facilitating collective bargaining between labor and management. It guarantees to workers the right to organize and bargain collectively. Its provisions protect and implement that policy for the benefit of both employees and employers, thereby protecting both parties from unfair labor practices that undermine this national policy.

Pursuant to § 8(d) N.L.R.A.,[1] procedure is set forth for terminating or modifying the agreement entered into. That provision is available whether this Court permits rejection of the contract or declines to do so.

All parties agree that 11 U.S.C. § 365 permits this Court, under proper showing, to order rejection of the contract. The

---

1. Termination or modification of a collective bargaining agreement is permitted by § 8(d) only if the moving party

  (1) serves a written notice upon the other party to the contract . . .;

  (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

  (3) notifies the Federal Mediation and Conciliation Service . . . and . . . any State or Territorial agency established to mediate and conciliate disputes within the State or Territory . . .;

  (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later: . . .

[T]he duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. 29 U.S.C. § 158(d).

standard of proof necessary is a matter of controversy. Courts previously considering this question have applied diverse standards. The courts seem to conclude that the rejection of the usual, routine executory contract which requires only a "business judgment" showing is quite different from a proposed rejection of a labor contract entered into and governed by the N.L.R.A.

In the recent case of *N.L.R.B. v. Bildisco, etc. (In re Bildisco)*, 682 F.2d 72 (3rd Cir. 1982), cert. granted *sub nom, N.L.R.B. v. Bildisco*, —— U.S. ——, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983), the Third Circuit Court of Appeals adopted the more stringent rule which requires a showing and requires the court to find after "thorough scrutiny and a careful balancing of the equities on both sides" before rejection should be ordered.

In applying the more stringent rule, this Court must be aware of the complexities involved in such contracts. It is not the function of the Bankruptcy Court, nor is there sufficient expertise if the function did exist, to negotiate labor-management contracts in Chapter proceedings in this Court. Theoretically, at least, the parties under the applicable rules negotiated the labor-management contract which was entered into in this case. Having done so in this field of extreme complexity involving enormous human effort and talent of both parties, the contract should not be lightly discarded upon the Debtor's motion. Indeed, the Court is aware of the admonition in *Bildisco, supra,* p. 80, that even if the Debtor-in-Possession rejects a collective bargaining agreement, the Debtor would remain an employer required to bargain with UMWA representatives under the N.L.R.A. Additionally, these employees would retain their right to strike should such negotiations fail.

Viewing the evidence before this Court, the Court must conclude that a proper case for rejection of this contract has not been made. Adequate explanation was not given as to why other contractors with Harman Mining were apparently operating successfully, including companies owned by those who are owners of the Debtor herein, in the same area and involving the same coal operation. It is true that the tax returns reflect losses in the fluctuating coal industry. However, it would appear that neither this Debtor nor other mine operators expect yearly to have a profitable balance sheet with substantial incomes derived by owners from their coal operations. This Court takes judicial notice of the fluctuating profits and losses in this particular industry. Whether the parties in their negotiations and labor-management contracts should or could accommodate these fluctuating conditions for the benefit of all parties is not for this Court to decide. The parties negotiated and entered into their contracts with knowledge of these infirmities. The right to reject and undo what they have done in this field should not be lightly undertaken by the court except under circumstances set forth in the rule by the court in *In re Bildisco, supra,* and only after a careful balance of the equities.

Accordingly, it is the conclusion of this Court that the motion to reject the contract in question be, and the same is

ORDERED

DENIED.