**In the Matter of ALAN WOOD STEEL COMPANY, Debtor.**

**Cause No. 77–390EG.**

United States District Court, E. D. Pa.

Feb. 1, 1978.

As Amended Feb. 9, 1978.

A. E. Lawson, Asst. Gen. Counsel to United Steelworkers of America, Pittsburgh, Pa., for appellant.

John S. Estey, Robt. H. Levin, James M. Peck, Philadelphia, Pa., for appellees.

## OPINION AND ORDER

HUYETT, District Judge.

The United Steelworkers of America (Steelworkers) appeal the decision of the bankruptcy court authorizing the Receivers of Alan Wood Steel Company (Receivers) to reject collective bargaining agreements between Alan Wood Steel Company (Debtor, Alan Wood) and the Steelworkers. We have jurisdiction to hear this appeal under Section 39(c) of the Bankruptcy Act, 11 U.S.C. § 67(c). For reasons stated below, we affirm the decision of the bankruptcy court.

On June 10, 1977, the Debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. On the filing

date, the collective bargaining agreements between the Debtor and the Steelworkers were in force. Subsequently, the Receivers and the Steelworkers entered into a series of negotiations to modify the terms of the bargaining agreement in an attempt to continue the Debtor's steelmaking operations. Although some relief from the terms of the agreements was eventually secured (Exhibit R–20), this relief was not sufficient to enable Alan Wood to extricate itself from its perilous financial position. Thereafter, the Receivers began to shut down the Debtor's steelmaking activities.[1]

Throughout this period, the Receivers continued to pay benefits under the collective bargaining agreements. These benefits, payable to current employees and to laid-off employees for a period of one year, consist of full medical benefits for employees and their families, life insurance, dental benefits, accidental death and dismemberment insurance, paid vacations, supplemental unemployment benefit fund contributions, and severance pay. (Finding of Fact No. 9) Additionally, retired employees continued to receive life and health insurance benefits to age sixty-five. (Finding of Fact No. 10) The Receivers considered the burden of paying these benefits, in view of the curtailed operations of the steel producing facilities, to be onerous. However, they were unsure of their obligations at that time. On August 30, 1977, the Receivers filed a petition for instructions with the bankruptcy court. (Record on Appeal No. 9) On September 7, 1977, the bankruptcy court denied the Receivers' petition for instructions, stating that where the Receivers' "course of conduct appears clearly defined, there is no reason for the receivers to ask for instructions merely to escape the performance of an unpleasant duty." (Record on Appeal No. 10)

Shortly thereafter, the Receivers filed a motion for authority under section 313 of the Bankruptcy Act to reject the collective bargaining agreements. A hearing was held on the motion on October 5, 1977, and the bankruptcy court issued an opinion granting the motion on October 27, 1977.

The bankruptcy court found that the operation of the Debtor's business in July and August of 1977 resulted in the loss of $2.8 million and $3.0 million respectively.[2] (Findings of Fact Nos. 12 and 13) The cost of funding the benefits provided by the collective bargaining agreements, exclusive of vacation and severance pay, was in excess of $2.1 million; vacation pay and bonuses amounted to more than $4.1 million for 1977 and 1978. (Findings of Fact Nos. 18 and 19) The bankruptcy court further found that an indeterminate liability existed for the payment of premiums for life insurance for retirees; this cost exceeded $14,000 per month in June, 1977, and $17,000 per month in September, 1977. (Finding of Fact No. 20) Furthermore, it was estimated that the cost of paying premiums for medical insurance for retirees would have exceeded $543,000.00 per year by December, 1977. (Finding of Fact No. 21) In view of the fact that the cost of the benefits under the agreements was found to exceed by $1.50 per hour the average costs of such benefits paid by Debtor's competitors (Finding of Fact No. 22), the bankruptcy court concluded that the cost of those benefits was onerous and burdensome to the Debtor's estate and the payment thereof would preclude the possibility of the Debtor effecting an arrangement under Chapter XI. (Finding of Fact No. 23) Un-

---

1. At the time the Debtor filed its Chapter XI petition, there were 1,770 employees working at the steel mill. By September 25, 1977, the Debtor's steelmaking activities had been curtailed, leaving only about 140 employees, who were working primarily on a caretaking basis. (Findings of Fact 14 and 15)

2. These losses do not account for the operations of the Debtor's subsidiaries, which operations generated a profit. *See* Receivers' Report of Operations for June, July, August, September and October. These corporations are entities separate from the Debtor, with entirely separate operations. Further, counsel for the Receivers represented to us at oral argument that all of the stock of the subsidiaries has been pledged; therefore, any profit they generate cannot, in any case, be used to make benefit payments under the collective bargaining agreements.

der these circumstances, the bankruptcy court concluded that rejection of the collective bargaining agreement was justified.

The counsel for the Receivers represented to us at oral argument that there was no possibility that the Debtor's steelmaking operations would be resumed.[3] Thus, this case does not involve the rejection of a collective bargaining agreement where the post-filing estate continues to be involved in the same activities as the pre-filing debtor. Receivers here are attempting merely to preserve the estate's existing physical assets.

### Power to Reject Collective Bargaining Agreements Pursuant to Section 313 of the Bankruptcy Act.

Our point of departure is to determine if section 313 of the Bankruptcy Act is applicable to collective bargaining agreements. Section 313 states that the bankruptcy court may "permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such parties in interest as the court may designate." The Steelworkers contend that, despite the lack of qualifying language in the statute itself, the bankruptcy court may not authorize the rejection of collective bargaining agreements. We cannot agree.

First, every case in which this issue has been considered, so far as our research has determined, has held that the receivers may be empowered to reject executory collective bargaining agreements under the terms of section 313. *E. g., Railway Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir. 1975); *Shopmen's Local No. 455 v. Kevin Steel, Inc.,* 519 F.2d 698 (2d Cir. 1975); *In re Bohack,* 541 F.2d 312 (2d Cir. 1976); *In re Penn Fruit,* 92 LRRM 3548 (E.D.Pa.1976).

Second, we believe that the language and policy of the Bankruptcy Act clearly support the conclusion that collective bargaining agreements may be rejected. The analysis provided by the Court of Appeals for the Second Circuit in *Shopmen's Local No. 455 v. Kevin Steel, Inc., supra,* is especially helpful. The *Kevin Steel* court resolved any potential conflict between section 313(1) of the Bankruptcy Act and section 8(a)(5) and (d) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (d), by focusing on the nature of the bankruptcy proceeding itself. The court observed that "A debtor-in-possession[4] under Chapter XI . . . is not the same entity as the pre-bankruptcy company. A new entity is created with its own rights and duties, subject to the supervision of the bankruptcy court." 519 F.2d at 704. Therefore, the court concluded, the post-bankruptcy entity is simply not a party to the labor contract negotiated by the pre-bankruptcy debtor. The *Kevin Steel* court also noted that Congress could have expressly excluded collective bargaining agreements from the category of executory contracts which could be rejected, but did not.[5] We find the Second Circuit's analysis to be persuasive, and therefore hold that collective bargaining contracts may be rejected pursuant to section 313.

### Showing Required to Justify Rejection of a Collective Bargaining Agreement.

The usual test used to determine if an executory contract should be rejected is whether rejection would benefit the estate. *See* 8 *Collier on Bankruptcy* ¶ 3.15[8].

---

3. A draft of a plan of arrangement was submitted to the unsecured creditors on December 6, 1977, portions of which were read to this Court. In general, the plan consists of the sale of all of the Debtor's assets except the stock of its two subsidiaries, and the possible sale of the coke mill and plate mill.

The Steelworkers do not contest these facts.

4. This case involves, of course, not a debtor-in-possession under Chapter XI, but a receiver appointed by the bankruptcy court. *See* sec-

tions 341–42 of the Bankruptcy Act, 11 U.S.C. §§ 741–42.

5. *See, e. g.,* section 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), which provides, in part, "No judge or trustee acting under this Act shall change the wages or working conditions of railroad employees except in the manner prescribed in the Railway Labor Act." *Id.* Thus, Congress clearly knew how to exempt labor contracts from the general power to reject executory contracts.

However, a collective bargaining agreement is not an ordinary commercial contract. We believe that an application to reject a collective bargaining agreement must be carefully scrutinized, in view of the strong federal policies favoring the enforcement of collective bargaining agreements.[6] See John Wiley & Sons v. Livingston, 376 U.S. 543, 550, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

The cases suggest that a two-step analysis be employed by the bankruptcy court in deciding whether to permit the rejection of a collective bargaining agreement. Shopmen's Local No. 455 v. Kevin Steel Products, Inc., supra; In re Penn Fruit Co., supra. First, the court should determine that the agreement is onerous and burdensome to the estate, so that failure to reject will make a successful arrangement impossible. Second, the equities must be balanced and found to favor the debtor. Then, and only then, may rejection of a collective bargaining agreement be permitted.

### Application of the Standard by the Bankruptcy Court in the Instant Case.

As this is an appeal from the decision of the bankruptcy court, Bankruptcy Rule 810 governs. This Rule provides that the district court shall accept the bankruptcy judge's findings of fact "unless they are clearly erroneous." Bearing in mind the two-step analysis that the bankruptcy court is required to employ, we now proceed to determine if the bankruptcy court in fact made the requisite findings, and if those findings withstand scrutiny under the "clearly erroneous" standard of Rule 810.

The bankruptcy court held a full evidentiary hearing on the Receiver's motion for rejection prior to reaching its decision. The bankruptcy court found as a fact that the contracts in question were onerous and burdensome and that payment of benefits under the collective bargaining agreement would preclude the possibility of effecting an arrangement. (Findings of Fact Nos. 22 and 23)

These findings are amply supported by the record. It is vital to note that Alan Wood has ceased all steelmaking operations; thus, it is generating virtually no income whatsoever. Victor J. Montemayor, President and Chief Executive of Alan Wood Steel, testified that payments of contract benefits could be made only from the existing assets. (N.T. 439–440) These are the very same assets which would be employed in any arrangement with the unsecured creditors. Therefore, it is clear that, in the absence of rejection of these agreements, an arrangement will be impossible to effectuate.[7]

The bankruptcy court concluded as a matter of law that "[a] careful balancing of the equities in this case requires the conclusion that they favor rejection of the collective bargaining agreement with the United Steelworkers of America . . . ." We are not entirely convinced that the court in fact balanced the equities as carefully as it should have; nevertheless, the facts surrounding this particular Chapter XI proceeding compel the conclusion that the equities favor the Receivers.

Two factors are crucial. First, the bankruptcy court found as a fact that "[t]he debtor and the receivers have, since the inception of these proceedings, negotiated, bargained and dealt with the Steelworkers and its members in good faith and out of a sincere desire to reach agreement." (Finding of Fact No. 24) There is no suggestion

---

6. The Receivers argued that this special scrutiny is required only if the debtor's business is ongoing. However, we prefer to view the state of the debtor's operation as only one factor to be considered in weighing the equities.

7. Counsel for the Steelworkers contended that the data necessary to evaluate adequately the Debtor's financial condition were not presented to the bankruptcy court, nor made available to the Steelworkers. Regardless of the merit of this argument at the time of the hearing on this motion in October, the Steelworkers have had ample opportunity since then to examine the records of the Debtor. In the absence of a specific showing by the Steelworkers that the financial data do not support the bankruptcy court's conclusions, we are unable to speculate as to the completeness or accuracy thereof.

whatsoever that the Receivers are improperly motivated in their attempt to reject the labor agreement. By contrast, the *Kevin Steel* court emphasized the fact that the debtor, prior to filing under Chapter XI, had been guilty of unfair labor practices. 519 F.2d 698. It was this very fact that led the Second Circuit to conclude that equities should be carefully balanced in deciding to permit rejection of a collective bargaining agreement. *Id.* at 707.

Second, the business of the Debtor—steelmaking—has been terminated with no possibility of recovery or recall of laid-off employees. In other cases dealing with this issue, the business of the debtor was ongoing throughout the Chapter XI proceedings. *E. g., Railway Clerks v. REA Express, Inc., supra; Shopmen's Local No. 455 v. Kevin Steel, Inc., supra; In re Bohack, supra.* In those cases, there were strong equities in favor of the employees who were continuing to work for the debtor, since rejection would have enabled the employer to alter the benefits received by those workers. Here, there are no further services to be performed by those employees who are laid-off or retired. The balance of equities is therefore critically different since the payment of benefits to the Steelworkers in this situation would drastically prejudice the position of the unsecured creditors.

The Steelworkers argued strenuously that, in view of the dire financial straits of the Debtor, it is inequitable to benefit other unsecured creditors at the expense of the union members, many of whom are retired or disabled. This argument carries little weight, however, in view of the fact that, even in the absence of rejection, the claims of the majority, if not all, of the Steelworkers would probably not have priority as costs of administration under section 64a(1) of the Bankruptcy Act.[8] *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir. 1976); *In re Public Ledger,* 161 F.2d 762 (3d Cir. 1947). The Steelworkers, like other unsecured creditors, are subject to the priorities set by Congress in section 64 of the Bankruptcy Act; this court is powerless to modify those priorities. Any resultant inequity is inherent in the Bankruptcy Act itself.

The financial difficulties of Alan Wood are a great tragedy. Although we are sympathetic to the plight of the Steelworkers, we find that we must agree with the decision of the bankruptcy court and permit rejection of the collective bargaining agreements.

8. Although the question of the priority position of the Steelworkers' claims absent rejection is in no way before us, we believe that the priority problem has a substantial bearing on the equities of the Steelworkers' position versus that of the Receivers. It was for that reason that we requested briefing and argument on this subject.

As we understand the position of the Receivers, the priority position of the Steelworkers' claims, even in the *absence* of rejection is governed by *In re Public Ledger,* 161 F.2d 762 (3d Cir. 1947). Under the *Public Ledger* doctrine, the fringe benefit claims which accrued after filing are treated as costs of administration and are given § 64a(1) priority; while those benefit claims which accrued before filing are treated as wage claims. *Accord, In re Mammoth Mart,* 536 F.2d 950 (1st Cir. 1976). Rejection or acceptance of the contract, therefore, would not alter the priority position of the Steelworkers, which is determined by § 64 of the Bankruptcy Act as interpreted in *Public Ledger.*

A problem arises because of the uncertainty created by a Second Circuit decision which rejects the *Public Ledger* doctrine. *See Straus-Duparquet, Inc. v. Local No. 3, IBEW,* 386 F.2d 649 (2d Cir. 1967). The Receivers fear that, in the absence of express rejection of the collective bargaining agreements, the benefit payments might be deemed costs of administration. Although the Receivers believe that the chance that this will occur is slight, the potential liability on the estate for these costs of administration is so large that it interferes with the Debtor's ability to effect a plan of arrangement.

We believe that this potential uncertainty strengthens the position of the Receivers in the instant dispute. Under the *Public Ledger* doctrine, the position of the Steelworkers is the same irrespective of our decision here. However, in the absence of rejection, the position of the Receivers is uncertain, thus affecting the Debtor's attempts to effect a plan of arrangement.