**In re BRIGGS TRANSPORTATION CO., Debtor.**

**Bankruptcy No. 4–83–2083.**

United States Bankruptcy Court, D. Minnesota.

March 30, 1984.

**344**

Joe A. Walters and James A. Rubenstein, O'Connor & Hannan, Minneapolis, Minn., for debtor.

David Leo Uelmen and Scott Soldon, Goldberg, Previant, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, Wis., for respondent Teamsters Nat. Freight Industry Committee & Affiliated Local Unions and Service Employees Intern. Union.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This motion came on for hearing on the motion of Briggs Transportation Co. for Court approval of its rejection of its collective bargaining agreements. Joe A. Walters and James A. Rubenstein appeared on behalf of the debtor. David Leo Uelmen and Scott D. Soldon appeared on behalf of the Teamsters National Freight Industry Committee, affiliated Teamster local unions and the Service Employees International Union.

Based on the evidence submitted at more than three and one-half days of hearings, briefs and arguments of counsel and all the facts and records herein, the Court makes the following:

## FINDINGS OF FACT

1. Briggs Transportation Co. is a publicly owned, regular motor carrier of primarily LTL (less-than-truck-load) shipments. Historically, the company's operations have been concentrated in Minnesota, Wisconsin, Iowa and the Chicago commercial zone.

2. 1978 was the last year in which Briggs reported a profit. Briggs' financial decline is generally attributed to an expansion of Briggs operation into long haul lanes in the late 1970's and early 1980's coupled with the deregulation of the trucking industry which has resulted in an increased competition for declining loads, as well as a general downturn in the nation's economy. (*See* Debtor's Ex. 44; Testimony of James N. Denn 8/31/83; Clifford Yentes 9/14/83; Norman A. Weintraub 9/19/83).

3. Briggs has suffered continuing losses from operations since 1979. In 1978, the company showed net earnings of $468,000 on operating revenues of $78 million. In 1979, Briggs lost $1,896,528 out of total revenues of $64,872,491. In 1980, Briggs suffered a net loss of over $6,000,000. Slightly over $1 million of this loss was a loss from operations. The balance of $5 million was the result of a required write-off for extraordinary loss of value from operating authority due to deregulation under the Motor Carrier Act of 1980. Briggs showed continuing losses in 1981 of $1,346,720. The gross revenues for 1981 were in excess of $66,791,931. (*See* Debtor's Ex. 33 through 36; testimony of Yentes 9/14/83; *See also* Union Ex. F).

4. In 1982, the last full calendar year prior to the filing of their petition, Briggs lost approximately $5,300,000 in operations out of the total revenue of approximately $60,000,000. In 1982, overall, Briggs' operating ratio showed that its operating expenses not including interest or extraordinary expenses were 113% of its revenues. (*See* Yentes testimony 9/14/83; *See also* Union Ex. 2).

5. Briggs has on several occasions attempted to raise needed working capital by offering stock purchase programs to its employees. Those programs have been

consistently well received. In 1974, employees purchased 135,000 shares at $5.00 per share. In 1976 employees purchased 160,000 shares at $4.00 per share. In 1980 employees purchased 304,000 shares at $3.00 per share. Employee response to the 1982 stock purchase plan was particularly impressive. After receiving substantial information regarding Briggs financial difficulties, Briggs employees purchased some 460,000 shares at $2.00 per share.

The 1982 program has not generated the full amount anticipated. Employees were given an option of purchasing with cash or through payroll deduction. Payroll deductions for stock purchases were suspended when the 15% contribution program went into effect, therefore, only four months of payroll deductions have been collected in the 1982 stock purchase program.

As a result of these programs, 75% of Briggs stock is held by employees and their families. 25% of Briggs stock is owned by its union employees (See testimony of Yentes 9/14/83; Debtor's Ex. 39 and 40).

6. Briggs filed a petition for reorganization under Chapter 11 of Title 11 of the United States Code on January 25, 1983.

7. Before filing, Briggs' daily revenues averaged $202,000. Since filing Briggs has reduced its operations and its daily revenues have decreased to an average of $80,000. Despite a substantial reduction in the scope of Briggs' operations through terminal closings, layoffs and other efforts, Briggs has continued to show a loss on its operations while in Chapter 11. During the period from January 25, 1983, the date of filing, through the end of July, Briggs, according to its monthly operating statements, has lost approximately $1 million. (See Debtor's Ex. 45 through 50; testimony of Lowell C. Brutlag and Yentes 9/14/83).

8. Prior to filing, Briggs operated 57 terminals in the midwest, the southeast and the southwest United States and employed approximately 1,100 employees, approximately 800 of which were covered by one or more collective bargaining agreements. (See Debtor's Ex. 36; Brutlag testimony 9/14/83).

9. Since filing, Briggs has substantially reduced the scope of its operations. Briggs immediately closed 35 of its terminals and laid off 800 of its employees. It now operates 22 terminals with approximately 400 employees, approximately 300 of which are covered by one or more collective bargaining agreements. (See testimony of Brutlag 9/14/83).

10. Briggs has commenced a program to sell approximately 1,500 pieces of excess equipment in an effort to reduce its secured debt and to generate capital. Selling equipment will also reduce the interest and carrying charges accruing to Briggs. Since filing, Briggs has also terminated its employee automobile program. More than 100 automobiles have been returned to the lessor or to the secured lender where there was no equity in the equipment. (See testimony of Brutlag 9/14/83).

11. Briggs has, in a number of cases negotiated extended terms and/or reduced monthly payments on equipment it is continuing to use. Briggs has moved its St. Paul headquarters into less expensive space. It has sublet portions of its excess space in several terminals which it continues to operate. (See testimony of Brutlag 9/14/83).

12. In addition to its efforts to reduce costs, Briggs has taken steps to increase revenues. Briggs retained a management consulting firm to review their operations and make recommendations to improve their profit potential. Briggs has also increased its sales efforts in an attempt to increase revenues. (See testimony of James Hillhouse 9/9/83; Brutlag 9/14/83; Debtor's Ex. 29–32 and 44).

13. Although Briggs has been relatively successful in reducing costs in some areas, it has been unable to substantially reduce its labor costs through means other than layoffs. Briggs labor costs are approximately 70% of Briggs' gross revenue, and are, therefore, one of its largest expenses. (See testimony of Harold Doyle 9/9/83; Union Exhibit X).

14. Since 1978, the number of Briggs' employees has declined from a high of 2,282 to the current low of approximately 400 (Debtor's Ex. 36, Page 5).

15. Briggs is a party to a number of collective bargaining agreements it negotiated and entered into prior to filing its bankruptcy petition. The majority of the Briggs union employees are covered by the National Master Freight Agreement together with the Central States Area, Over-the-Road and Local Cartage Supplements. These agreements were negotiated by the International of Brotherhood of Teamsters and its affiliates. Certain Teamster Locals have separate but substantially similar agreements. Other locals have modified the above agreements with riders and/or addenda. (See generally, Debtor's Ex. 12 through 14).

16. Of the Briggs' employees covered by collective bargaining agreements other than those with the Teamsters and their affiliates, 25 are subject to an agreement between Briggs and the Chicago Truck Drivers Union (independent), 16 are covered by agreements with the International Association of Machinists and Aerospace Workers (AFL–CIO) (IAM) and the remainder by the Service Employees International Union. (See Debtor's Ex. 12–20, 12–9 and 12–17 respectively).

17. With the exception of the 15% individual give back program, in which the unions played only a passive role, discussions between Briggs and various union representatives regarding modifications of the collective bargaining agreements have been unproductive. The unions to date have not granted any meaningful concessions either in compensation or the terms and conditions of employment conditions. (See testimony of Rivard 8/31 and 9/9/83; Debtor's Ex. 7–11).

18. The wage and compensation benefit structure of the collective bargaining agreements to which Briggs is a party is primarily based on the National Master Freight Agreement with the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America as modified by various local and regional riders and addenda. That agreement provides that over-the-road truck drivers be paid between $.3175 and $.3225 per mile with a cost of living adjustment, depending upon the weight of the load and the number of axles of the vehicle driven with a guarantee of 8 hours per day at a minimum of $13.15 per hour. In addition, the contract provides for health and welfare benefits to be paid at $58.70 per week and pension contributions of $55.00 per week. These contributions are made regardless of how many hours in the week are actually worked. The contract also provides that employees be paid annually five eight hour days of sick leave, three emergency leave days, time off for jury duty plus ten paid holidays and between one and five weeks of vacation depending on seniority. (See Debtor's Ex. 13; testimony of Rivard 9/9/83).

The local cartage supplement provides for local cartage drivers to be paid between $13.21 and $13.31 per hour. Health and welfare benefits are paid at $45.50 per week and pension contributions of $55.00 per week must be made. With certain exceptions, vacation, sick leave and holidays as well as cost of living adjustments are given in accordance with the National Master Freight Agreement. (See Debtor's Ex. 14 and 13; testimony of Rivard 9/9/83).

Clerks covered by the National Master Freight Agreement are paid between $11.02 and $13.29 per hour with health and welfare, pension and leave provisions similar to those described above. (See testimony of Rivard 9/9/83).

19. Employees covered by the collective bargain agreement between Briggs and the IAM receive between $13.61 and $15.37 per hour. Health and welfare benefits are paid at $180.00 to $303.00 per month and pension contributions of between $33.00 and $46.00 are made weekly. The single member of the Employee Service Union which Briggs currently employs is paid $12.85 per hour with the fringe benefits provided for in the National Master Freight Agreement. The remaining union employees retained by

Briggs, with the exception of local 100, are paid at a slightly higher wage rate than that provided in the National Master Freight Agreement but slightly lower fringe benefits. The average wage for union employees in 1982 was $25,137.00 plus fringe benefits. (*See* testimony of Rivard 9/9/83; Brutlag 9/14/83; Debtor's Ex. 12).

20. The impact of Briggs' obligation to pay the benefits and compensation provided by the current collective bargaining agreement is compounded by the high seniority and maturity of the employees which continue to work. For example, the majority of the currently employed truck drivers are eligible under the National Master Freight Agreement for five weeks of vacation. The National Master Freight Agreement was negotiated assuming an average of three weeks vacation per employee per year. (*See,* testimony of Rivard 9/9/83; Weintraub 9/19/83; Debtor's Ex. 27).

21. Briggs' continued operation under the terms of the collective bargaining agreements substantially reduces its flexibility in the means by which it can affect a successful reorganization. In addition to the compensation and benefits package to which Briggs is committed, certain work rules and practices are also provided for in its collective bargaining agreements. These rules and practices are in some instances costly and generally inhibit Briggs' ability to adapt its business to its changing needs. Some of the most burdensome of these rules are rules which have become grafted on to the collective bargaining agreement through past practices. Generally, local practices that have been in existence for greater than 90 days becomes binding on the company. Examples of this type of rule which the debtor is now bound by and which it finds particularly restrictive are the "drop and hook rule" and the "120 squeeze" incorporated into the union contract through Article 6, Section 1 of the National Master Freight Agreement. (*See* Debtor's Ex. 13, Page 22 and 23; testimony of Rivard 9/9/84).

22. The "drop and hook" practice means that if an over-the-road driver pulls into an open Briggs terminal, the work of parking the trailer the driver hauled into the terminal (the drop) and hooking the tractor up to a different trailer so the driver may continue trip (the hook) must be performed by an employee at the open terminal. This means that the local driver or dock worker must stop whatever he is doing and perform the drop and hook, while the over-the-road driver does nothing. Thus, two people are paid for the work of one. (*See* testimony of Rivard 9/9/84).

23. The "120 squeeze" gives the St. Paul Teamsters Local 120, with one or two minor exceptions, exclusive jurisdiction for hauling freight into or out of the St. Paul terminal. This means, for example, that if there is freight in Chicago or Madison to be hauled into St. Paul, Briggs must use drivers based in St. Paul to go out to the location and bring the freight in. It would be more efficient and less costly for Briggs to use a driver based in Madison or Chicago to make the run or to have a St. Paul driver haul a load halfway to Chicago and a Chicago driver haul a load halfway to St. Paul, switch loads and return to their home bases. These practices are currently prohibited by Article 6 and 8 of the National Master Freight Agreement. (*See* Debtor's Ex. 13; testimony of Rivard 9/9/83).

24. The union contracts, also restrict the general nature and structure of Briggs' business operations. Provisions of the current collective bargaining agreement prohibit an employer who did not, at the time the contract was entered into have a past practice of contracting out work or a special commodities division, from developing them except in dealing with new business. This restriction inhibits Briggs from developing any substantial long haul full load business. Long haul business is more profitable than short haul business because the cost of the pickup and delivery on either end can be spread over the higher tariff rate that long haul commands. In turn, labor costs, thus profit margins on full load long haul traffic can be maximized by carriers with special commodities divisions be-

cause they have the flexibility of using independent contractors or alternative means of transportation to move the TL freight. (*See,* testimony of Rivard 9/9/83; Debtor Ex. 13 Article 32).

25. The only reduction in Briggs' labor costs the debtor has been able to effectuate, is a 15% contribution program under which individual union employees voluntarily contributed 15% of their gross pay to the company. This program was in effect from August 1, 1982 until July 31, 1983. 87% of Briggs union employees participated in the program. Non union employees were required to participate. The contribution program resulted in a 13% overall reduction of Briggs normal payroll. (*See* Debtor's Ex. 41, 42, 44, Union Ex. C; testimony of Rivard 9/9/83; Yentes and Brutlag 9/14/83).

26. Briggs has made several attempts to work with its unions to obtain voluntary concessions designed to reduce Briggs' labor costs. On June 24, 1983, Briggs met with Jackie Presser, President of the International Brotherhood of Teamsters in Washington, D.C. At that meeting, the union took the position that it would not negotiate with representatives of individual carriers who were members of employers groups who were signatories to the National Master of Freight Agreement. They did advise Briggs, however, that some relief from the National Master of Freight Agreement would be forthcoming on a national basis. These concessions, however, relate to call backs, and since Briggs' business is contracting rather than expanding, these concessions would not have been meaningful to Briggs. In any case, these concessions were rejected by the membership. (*See,* testimony of Rivard 8/31/83).

27. On August 18, 1983, Briggs organized a meeting with union officials in Chicago. (*See* Debtor's Ex. 7). Prior to that meeting, Briggs distributed a proposal regarding modifications of the various collective bargaining agreements which it intended to discuss at the meeting. The unions Briggs contacted advised Briggs, either at the meeting or prior thereto, that they were unwilling to negotiate any reductions in wages and conditions of employment. (*See* testimony of Rivard 8/31/83; Debtor's Ex. 7–11). Representatives of the Teamsters National Negotiating Committee also rejected Briggs proposal.

28. On August 20, 1983, Briggs filed its motion seeking approval of this Court of its rejection of the following union contracts:

A. National Master Freight Agreement and Central States Area Over-the-Road Supplemental Agreement for the period of March 1, 1982 through March 31, 1985.

B. Central States Area Local Cartage Supplemental Agreement covering employees of private, common, contract and local cartage carriers for the period of March 1, 1982 through March 31, 1985.

   Together with all local supplements to one or both of the above agreements including but not limited to: Twin City Rider covering Local Union 120, St. Paul, Minnesota, and Local Union 544, Minneapolis, Minnesota; Rider for Teamster Local Union No. 844, Waterloo, Iowa and Vicinity 50703; Letter of Understanding and Rider for Chauffeurs, Teamsters and Helpers Local Union No. 238, Cedar Rapids, Iowa; Addendum with General Drivers and Helpers Union Local No. 554 of Grand Island, Nebraska; Riders with Teamsters Local No. 325, Rockford, Illinois, Addenda with Local Union No. 147, Des Moines, Iowa; Appendix with Local 828, Mason City, Iowa.

C. Southern Conference Area Local Freight Forwarding Pick Up and Delivery Supplemental Agreement for the period of April 1, 1982 through March 31, 1985, International Brotherhood of Teamsters.

D. Southern Conference Area Over the Road Supplemental Agreement for the period April 1, 1982 through April 31, 1985 with the International Brotherhood of Teamsters.

E. Western States Area Pick Up and Delivery Local Cartage and Dock Work-

ers Supplemental Agreement, April 1, 1982 through March 31, 1985 with the International Brotherhood of Teamsters.

F. Labor Contract and Working Agreement covering office and miscellaneous truck terminal employees, etc., Local Union No. 710 (Chicago) affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of American covering April 1, 1982 to and including March 31, 1985.

G. Labor Contract and Working Agreement covering Spotters, Fuelmen, Working Foremen, etc., with Local Union No. 710 (Chicago) affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America covering April 1, 1982 to and including March 31, 1985.

H. National Master Freight Agreement and Over the Road Central State Area Supplemental Agreement with Local Union No. 710 (Chicago) affiliated with the International Brotherhood of Teamsters.

I. Area Agreement covering the period July 1, 1982 through June 30, 1985 covering the International Association of Machinists and Aerospace Workers, AFL–CIO, and Local or District Lodges signatory thereto: Lodge No. 254 (Des Moines, Iowa), Lodge No. 778, District No. 71 (Kansas City, Missouri), District No. 10, Lodge No. 510 (Milwaukee, Wisconsin), District No. 77 (Minneapolis-St. Paul, Minnesota), Local Lodge No. 31 (Omaha, Nebraska) and District No. 9 (St. Louis, Missouri).
1) Omaha, Nebraska, Truck Transportation, Lodge No. 31, IAMAW, July 1, 1982 through June 30, 1985.
2) Addendum, Truck Transportation—Local Lodge No. 254, Des Moines, Iowa, July 1, 1982 through June 30, 1985.
3) Lodge 1406, District 121 I.A.M. & A.W., Supplemental Agreement to Area Agreement (Madison, Wisconsin).

J. Agreement effective May 1, 1982 through April 30, 1985 covering Foremen, Mechanics, Helpers, Apprentices and all other employees coming under the jurisdiction of the Automobile Mechanics Local No. 701, International Association of Machinists & Aerospace Workers, AFL–CIO, 133 South Ashland Avenue, Chicago, Illinois 60607.

K. Agreement dated January 22, 1982 between Briggs Transportation Co. and Teamsters Local Union No. 961 of Denver, Colorado (office workers).

L. Articles of Agreement executed October 4, 1982 between Briggs Transportation Co. and the General Drivers, Helpers and Truck Terminal Employees, Local Union No. 120, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (St. Paul, Minnesota).

M. Agreement entered into March 15, 1981, between Briggs Transportation Co. and Truck Drivers, Chauffeurs and Helpers Local Union No. 100, and affiliate of the International Brotherhood of Teamsters for Cincinnati, Ohio.

N. Kansas City Office Contract for the period of April 1, 1979 through March 31, 1982 with Local Union No. 41, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

O. The Office and Mechanics Agreement with Indianapolis, Indiana Teamsters Local No. 135 effective March 1, 1982 through March 31, 1985.

P. Agreement with Teamsters Local 89, Louisville, Kentucky, regarding local cartage and over-the-road contracts.

Q. Agreement between Service Employees International Union, Division 189 (Chicago, Illinois) and Illinois Trucking Associations, Inc. of Illinois and Motor Carrier Labor Advisory Council, effective April 1, 1982 through March 31, 1985.

R. Motor Carrier—Service and Garage Agreement, Motors Carrier Council, St. Louis, Inc. of the Automotive, Pe-

troleum and Allied Industries Employees Union Local 618, International Brotherhood of Teamsters.

S. Letter Agreements concerning wages with the following local unions in the Southern Conference: Nashville, Tennessee, International Brotherhood of Teamsters Local 480, Little Rock, Arkansas, International Brotherhood of Teamsters Local 878, Memphis, Tennessee, International Brotherhood of Teamsters Local 667, Dallas, Texas, International Brotherhood of Teamsters Local 745.

T. Agreement with Chicago Truck Drivers Union (Independent) covering the period April 1, 1982 through March 31, 1985.

U. Agreement with Chicago Produce Drivers, Teamsters Local 703, for April 1, 1982 through March 31, 1985.

V. Letter of Recognition with Oklahoma City, Oklahoma, International Brotherhood of Teamsters Local 886.

29. Since the conclusion of the hearings on the Debtor's motion, at the Court's insistence, Briggs has made at least one additional attempt to negotiate voluntary concessions. Briggs met with Jack B. Yager, Director of the Freight Division of the Central Conference of Teamsters negotiating committee. This effort apparently also proved unsuccessful. (*See* letter from Joe A. Walters dated October 13, 1983).

30. Teamsters have agreed with some competitors of Briggs to rates of pay and fringe benefits which are less expensive to the company per employee than the contract rates which Briggs must pay. (*See* Debtor's Ex. 15 through 23 and the summary in Ex. 25).

31. Two such contracts are with the Teamsters Local 120 of St. Paul (*See* Debtor's Ex. 18 and 22). One of these provides for local cartage hourly rates of pay at $10.82 and an over-the-road mileage rate of $.25 per mile. Other call for an hourly rate of $12.68 and a mileage rate of $.26 per mile. In contrast, under the Teamsters contract, Briggs must pay its local drivers who are members of the same union a base rate of $13.21 an hour and an average of $.32 per mile for its over-the-road drivers. (*See* Debtor's Ex. 13, Page 108; Ex. 14, Page 115).

32. While the high cost of Briggs labor could be offset by increased revenues, the outlook for a major increase in revenues is not good in view of the current conditions in the transportation market. The depressed economy and its continuing effects in the geographic areas which Briggs serves, means that the prospects for a general increase in shipping activity, in which Briggs could participate, is uncertain at best. (*See*, testimony of James N. Denn 8/31/83; James Hillhouse 9/9/83; Debtor's Ex. 1–6).

33. Deregulation of the trucking industry has led to the entry into the market of many new carriers, both union and non union. This means that the revenues from the available shipping business are spread thinly. As Minnesota Motor Transportation Association President, James N. Denn testified, the industry wide rate of return in the trucking industry in 1982 was one-half of one percent, the worst year in trucking business history. This was the result of large reductions in the amount of freight and the large rise in the number of carriers. This, in turn has led to cutthroat competition and rate reductions in some cases to below profitable levels. (*See* testimony of Denn and W.A. Hallman 8/31/83).

34. The situation has not improved in 1983. Traffic in the Minneapolis/St. Paul terminal area for the week ending August 8, 1983 dropped 8% from the previous week. This was 11.9% below this same week one year earlier. There has not been a week since January 1983 in which the Minneapolis/St. Paul terminal area truck loan traffic has been as good or better than the same week in the preceding calendar year. (*See* testimony of Denn 8/31/83).

35. The deregulation of the trucking industry occasioned by the passage of the Motor Carrier Act of 1980 has changed the basic economy of the trucking industry. In the absence of the previously controlled

collective rate making, there are no compulsory rate levels, therefore, more carriers are competing for less freight at lower prices. To survive the competition, a carrier must be more efficient and less costly than ever before. (*See* testimony of Denn 8/31/83).

36. Absent a vast and sudden change in the market for Briggs shipments and absent an increase in the volume of available freight, there is little hope that Briggs can operate profitably under its current union contracts. This is true despite Briggs' cost cutting efforts in areas other than direct labor. Briggs projected a loss of over $4.5 million for 1983 (based on revenues since the filing of the bankruptcy petition) if it continues to honor its current contract provisions for wages and fringe benefits. (*See* testimony of Yentes 9/14/83; Debtor's Ex. 51).

37. The likelihood of Briggs liquidation is much greater without the rejection of the collective bargaining agreements. Briggs will not survive if it does not reduce labor costs substantially. Briggs could endure on the short term if it can reduce its labor costs to 58% of gross revenues. Even at this rate, Briggs would be unable to replace necessary equipment, therefore, such a reduction would only delay Briggs liquidation. To survive, in the long term, Briggs must reduce its labor costs to below 55%. Briggs' current labor costs are 70% of gross revenues. The industry standard is between 56% and 60%. According to testimony, most companies strive for labor costs of 54% of gross revenue. (*See* testimony of Doyle and Norman McGibbon 9/9/83; *see also* Union Ex. X).

38. The short term benefit of refusing to permit rejection of Briggs' union contracts would be that current Briggs employees would continue to receive their contractual wages and fringe benefits for a short period of time before liquidation.

39. Liquidation will detrimentally effect Briggs employees. Liquidation will put virtually all Briggs current union and non-union employees out of work immediately. It is unlikely they will be able to find similar employment elsewhere. The layoff rate among Teamsters trucking company employees continues to rise. There have been estimated layoffs for April 1983 of between 28.58% and 35.74%. This is an increase in layoffs of 3% to 4½% from April 1982. Thus, not only will Briggs employees lose their current employment in a liquidation, it is unlikely they will be able to find comparable employment elsewhere in the industry. (*See* Debtor's Exhibit 6).

40. Briggs employees will also be negatively affected by a liquidation because as a result of the series of stock purchase plans Briggs offered its employees, 75% of its stock is owned by Briggs employees and their families. In a liquidation, their shareholdings would be worth nothing. (*See* testimony of Yentes 9/14/83; Weintraub 9/9/84).

41. Many of Briggs employees as well as union pension and health and welfare funds, already have substantial prepetition claims. These claims very nearly, if not completely, exhaust the priority treatment allowed to the first $2,000 of such claims. (*See* 11 U.S.C. § 507(a)(3) and (4)). Any claims which may be made for damages out of rejection for the collective bargaining agreement would thus be treated as general unsecured claims 11 U.S.C. § 365(g)(1) and § 502(g). On liquidation employees would receive little or nothing on these claims. In a reorganization, however, this treatment would greatly increase the likelihood that all participants (debtor, creditors, shareholders and employees) in the Chapter 11 proceeding will receive a greater benefit in the long run. (*See* testimony of Yentes 9/14/83).

42. If Briggs is permitted to reject its union contract, Briggs current employees will benefit. Rejection will permit them to continue earning a living while allowing Briggs the flexibility it needs to successfully reorganize. It will also increase the potential of employee shareholders receiving a return on their investments.

43. Based on the foregoing, it is clear that the collective bargaining agreements which Briggs Transportation Co. seeks to

reject are burdensome to the estate. Forcing the debtor to continue to operate under the terms of the current collective bargaining agreement substantially decreases the likelihood of a successful reorganization and would probably result in a liquidation of the debtor in the long term.

## CONCLUSIONS OF LAW

Prior to the Supreme Court's recent decision in *NLRB v. Bildisco,* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), there was conflicting authority on the standard to be applied by Bankruptcy Courts when deciding a debtor's motion to reject a collective bargaining agreement as an executory contract under § 365(a) of the Bankruptcy Code.[1] The split in authority focuses primarily on the apparent conflict between the Bankruptcy policy of giving a debtor a fresh start and the policy of the

National Labor Relations Act (NLRA) of discouraging labor strife by encouraging enforcement of collective bargaining agreements. Under § 365, a business judgment test is the usual standard for rejection of executory contracts. On the other hand, § 8(d) of the NLRA, 29 U.S.C. § 158(d), provides a four step detailed process that a moving party must follow in order to terminate or modify a collective bargaining agreement. While most courts have concluded that § 8(d) notwithstanding, collective bargaining agreements are subject to rejection under § 365, they have generally agreed, that because of the favored status of labor agreements, a more stringent standard for rejection than mere business judgment must be applied. Beyond this point, courts have not agreed on what this more stringent standard should be.[2]

---

**1.** Section 365(a) of the Bankruptcy Code provides, in pertinent parts,

> The trustee, subject to the courts approval may assume or reject an executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a) (1978).

**2.** A review of the major decisions indicates that the courts treat the power to reject and the standard for rejection as separate issues. Although the courts concede that collective bargaining agreements governed by the NLRA are not immune from rejection, and thus, not unique among executory contracts, the courts nevertheless devised a special standard for rejection of collective bargaining agreements in order to reconcile the NLRA with the Bankruptcy Code. Thus, the special rights accruing to employees under the federal labor laws find protection in the test applied by the Bankruptcy Court in determining whether to permit the rejection of the collective bargaining agreement. Until the Supreme Court decided *NLRB v. Bildisco,* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), three circuits had advance approaches to this problem. In *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698 (2d Cir.1975), the Court of Appeals for the Second Circuit, reconciled any potential conflict between § 313(1) of the old Bankruptcy Act and § 8(d) of the NLRA by focusing on the nature of the bankruptcy proceeding itself. The court observed that a debtor in bankruptcy is not the same entity as the pre-bankruptcy company. A new entity is created which is not a party to a collective bargaining agreement, and thus, not subject to the termination provisions of § 8(d) of the NLRA. The Second Circuit concluded that § 313(1) of the Bankruptcy Act

allows rejection of a collective bargaining agreement as an executory contract. The court, however, did not employ the business judgment test. The court held that "the decision to allow rejection should not be based solely on whether it will improve the financial status of the debtor. Such a narrow approach totally ignores the policies of the Labor Act and makes no attempt to accommodate to them." *Id.* at 707. The *Kevin Steel* court concluded that "... thorough scrutiny, and a careful balancing of the equities on both sides" is required to accommodate the favored status of collective bargaining agreements. *Id.* at 707.

The Court of Appeals for the Second Circuit took the *Kevin Steel* balancing of the equities test one step further in the case of *Brotherhood of Railway, Airline, and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). The court stated that in view of the serious effect rejection has on the debtor's employees, permission to reject a collective bargaining agreement should be granted "only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the [company] will collapse and the employees will no longer have their jobs." *Id.* at 172. Subsequent decisions have established a two-step analysis for determining whether to permit rejection of a collective bargaining agreement. The court in *In re Alan Wood Steel Co.,* 449 F.Supp. 165 (E.D.Pa.1978) articulated the standard as follows:

> First, the court should determine that the agreement is onerous and burdensome to the estate, so that failure to reject will make a successful arrangement impossible. Second,

In *Bildisco* the court unanimously[3] agreed that collective bargaining agreements subject to the NLRA are executory contracts within the meaning of § 365(a) of the Bankruptcy Code and may be rejected upon the appropriate showing. *NLRB v.*

the equities must be balanced and found to favor the debtor.
*Id.* at 169.

In *NLRB v. Bildisco*, 682 F.2d 72 (3d Cir.1982), *Aff'd* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Court of Appeals for the Third Circuit first held that § 365(a) of the Bankruptcy Code authorizes the Bankruptcy Court to permit the rejection of collective bargaining agreements. The court observed that Congress excluded only railway labor agreements from the operation of § 365(a). The court reasoned that this "permits an inference that, with this one exception, Congress did not intend to distinguish collective bargaining agreements from executory contracts in general." *Id.* at 78. In addition, the court stated that a debtor in bankruptcy is a new entity, and therefore, able to reject the labor agreement without following the procedures outlined in § 8(d).

The Third Circuit rejected the extreme necessity standard which requires a debtor to show that the company will collapse if rejection is not allowed. The basis for rejection of this stringent standard was two-fold:

First, ... it may be impossible to predict the success *vel non* of a reorganization until very late in the arrangement proceedings; and second, ... the imposition of such a test unduly exalts the perpetuation of the collective bargaining agreement over the more pragmatic considerations of whether the employees will continue to have jobs at all.

*Id.* at 80.

Instead, the Third Circuit adopted the *Kevin Steel* balancing of the equities test. The court noted that,

*Kevin Steel*, isolated from its illegitimate progeny, provides ... an intelligent and equitable approach ... because it gives collective bargaining agreements a measure of protection beyond that available under the business judgment test without unduly advancing the interests served by the Labor Act over the other interests of the employees and those of the debtor's other creditors ... It plots a middle course between the possible extremes, requiring a sensitive weighing of the competing private and public interests ....

*Id.* at 79, 81.

In *In re Brada-Miller Freight Systems, Inc.*, 702 F.2d 890 (11th Cir.1983), the Eleventh Circuit held that collective bargaining agreements are subject to rejection under § 365(a) of the Bankruptcy Code. The *Brada-Miller* court attempts "to reconcile the statutes in a manner which best effectuates the intent of Congress." *Id.* at 896. The court noted that Congress did not intend to distinguish collective bargaining agreements protected by the NLRA from executory contracts in general. Congress excluded only railway labor agreements from the opera-

tion of § 365(a). This action by Congress, the court states, shows that "Congress knew how to remove labor agreements from the scope of a general power to reject executory contracts." *Id.* at 896 (quoting *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir.1975)). The *Brada-Miller* court rejected the new entity theory set forth in *Kevin Steel*. The Court observed that "the most obvious problem with the new entity theory is the statutory requirement that a debtor-in-possession, purportedly not a party to contracts executed by the pre-bankruptcy corporation, apply to the Bankruptcy Court for approval of its rejection of a collective "bargaining" agreement."

The Eleventh Circuit also rejected the extreme necessity standard. The court explained that this standard,

imposes an excessive burden on the debtor-in-possession, one that subordinates the myriad of diverse interests at stake to a single issue: the ability of the debtor-in-possession to show by a preponderance of the evidence that forced liquidation is a certainty absent a rejection of the collective bargaining agreement ... To elevate this single consideration to such a dominant and decisive position allows the issue of rejection to be settled without any consideration of the interests of other parties involved, a total abdication of the policies behind the bankruptcy laws.

*Id.* at 899. The Eleventh Circuit concluded, as did the Third Circuit in *Bildisco*, that "the *Kevin Steel* balancing of the equities test provides a more satisfactory accommodation of the conflicting interests at stake in a rejection proceeding." *Id.* at 899. In addition, the court identified several factors that the Bankruptcy Court should consider before permitting rejection of collective bargaining agreements: the probability of liquidation, harm to employees resulting from breach of the agreement, the cost-spreading abilities of the parties, the degree of cooperation of the parties, and the good faith of the employer in seeking rejection.

3. In addition to deciding the standard to be applied to a debtor's motion to reject collective bargaining agreements, the court in *Bildisco* decided that a debtor who unilaterally rejects or modifies its collective bargaining agreements after filing its bankruptcy petition but prior to obtaining court approval is not guilty of an unfair labor practice. Justices Brennan, White, Marshall and Blackmun dissented from this part of the *Bildisco* decision. Briggs has not unilaterally rejected its agreements pending this order even after the *Bildisco* decision. This is to Briggs credit.

*Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).[4] The court agreed with the Circuit Courts of Appeals which had decided "that because of the special nature of collective bargaining agreements ... a somewhat stricter standard should govern the decision of the bankruptcy court to allow rejection of collective bargaining agreements. *Id.* at ——, 104 S.Ct. at 1195. The court, however, held that the extreme standard applied by the Court of Appeals for the Second Circuit in *REA Express*[5] was "fundamentally at odds with the policies of flexibility and equities built into Chapter 11 of the Bankruptcy Code." *Id.* at ——, 104 S.Ct. at 1196. The court stated,

> The rights of workers under collective bargaining agreements are important, but the *REA Express* standard subordinates the multiple, competing considerations underlying a Chapter 11 reorganization to one issue: whether rejection of the collective bargaining agreement is necessary to prevent the debtor from going into liquidation. The evidentiary burden necessary to meet this stringent standard may not be insurmountable, but it will present difficulties to the debtor-in-possession that will interfere with the reorganization process.

*Id.* at ——, 104 S.Ct. at 1196.

In recognition of the importance in Chapter 11 cases of flexibility, equity and minimizing the interference in the reorganization process, the court in *Bildisco* adopted, with some additional requirements, the standard applied by the Court of Appeals for the Eleventh Circuit in *Brada-Miller*.[6]

According to this standard, "the Bankruptcy Court should permit rejection of a collective bargaining agreement under § 365 of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate and that, after careful scrutiny, the equities balance in favor of rejecting the labor contracts."

*Id.* at ——, 104 S.Ct. at 1196. The court added two additional requirements to the *Brada-Miller* standard in *Bildisco*. First, according to *Bildisco*, "before acting on a petition to modify or reject a collective bargaining agreement ... the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution." *Id.* at ——, 104 S.Ct. at 1196. And second, the Bankruptcy Court must make "a reasoned finding on the record that the Chapter 11 policy of permitting successful rehabilitation of the debtor would be served by the rejection." *Id.* at ——, 104 S.Ct. at 1197.

■ The court directs that the determination of what constitutes a successful rehabilitation is to be made by balancing the interests of affected parties. *Bildisco* requires the Bankruptcy Court to balance these interests by considering the likelihood and consequence of liquidation on the debtor if the rejection is not permitted, the reduction in the value of the creditors claims occasioned by rejection, the hardship that would be imposed as well as the impact of rejection on employees. This balance is to be struck upon consideration of the comparative degree of hardship imposed on each party as well as any "qualitative differences between the types of hardships each may face." *Id.* at ——, 104 S.Ct. at 1197. Notwithstanding the foregoing specific considerations on which the Bankruptcy Court must base its decision, the court in *Bildisco* presents the caveat that the Bankruptcy Code "does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization," the ultimate goal of Chapter 11. *Id.* at ——, 104 S.Ct. at 1197.

Applying the *Bildisco* standard to the facts in this case, I believe Briggs' motion

---

**4.** *NLRB v. Bildisco* can now be found at —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

**5.** *Brotherhood of Railway and Airline Clerks v. REA Express, Inc.,* 523 F.2d 164, 167–169 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). *See* n. 2.

**6.** *In re Brada-Miller Freight Systems, Inc.,* 702 F.2d 890 (11th Cir.1983). *See* n. 2.

to reject its various collective bargaining agreements should be granted.

## A

■ The threshold requirement of the standards set out in *Bildisco* for rejection of executory contracts is that to be rejected a collective bargaining agreement must be burdensome to the estate. There can no question that where, as in this case, an obligation amounts to 70% of the debtor's gross revenues it is a substantial burden on the estate. The impact of this burden on the debtor is demonstrated in this case where the debtor has attempted to reduce its operating costs through means other than reduction of labor costs and to increase its revenues relative to operating costs but is still unable to operate without showing substantial losses.

■ During the period from the date of filing, January 23, 1983, through July 31, 1983 alone, Briggs reported a loss of nearly $1 million. This loss was in spite of a major reduction in the scope of Briggs operation since filing. Briggs has closed 35 of its terminals and laid off more than 800 of its employees. Briggs has attempted to reduce its debt load by selling excess equipment, terminating its employee automobile program and negotiating extended terms and/or reduced monthly payments for equipment it continues to use. Briggs has attempted to reduce other costs by moving into less expensive leased space and leasing space which it is no longer using. Although the reduction of the scope of Briggs' operating has resulted in a reduction of its costs, it has also resulted in a decrease of Briggs' revenues. Prior to filing, Briggs daily revenues averaged $202,-000. At the time of the hearings, after the reduction in its operations, Briggs averaged daily revenues are approximately $80,000. Briggs' labor costs are fixed in a series of collective bargaining agreements, supplements, riders and addenda. (*See* Findings of Fact No. 29). Given the circumstances outlined above, I believe those contracts are burdensome to the estate.

## B

■ The more difficult requirement of the *Bildisco* standard is that the Bankruptcy Court, "after careful scrutiny" decide that the equities of the case balance in favor of rejecting the labor contracts. In making this decision, the Bankruptcy Court must balance the interests of affected parties, the debtor, creditors and employees. The balancing of equities in collective bargaining agreement rejection cases is particularly troublesome because it often results in pitting the interest of current employees in continuing to work under the terms provided for in the collective bargaining agreements against the interest of virtually all other parties involved. While the fact remains that a reduction in compensation to current Briggs employees may result from the rejection of Briggs' collective bargaining agreements, the facts in this case make that result less onerous than the probable result of not allowing Briggs to reject.

While denying Briggs' motion for approval to reject its collective bargaining agreements may not result in an immediate liquidation, Briggs continued operation with a labor to gross revenue ratio in excess the 58% will prevent Briggs from making capital investments such as replacing equipment. This will preclude Briggs long term survival. Therefore, the likelihood of liquidation is increased in the absence of rejection.

In the event of a liquidation, all Briggs employees will be terminated, with no opportunity to be recalled. In addition, giving the current state of the trucking industry, it is unlikely they will be able to obtain similar employment elsewhere. In a liquidation, Briggs employees claims for damages and past due wages would be reduced to the status of general unsecured creditors for all but the limited priority status provided for in § 507. Given the current financial position of Briggs, unsecured creditors would receive nothing. Finally, because a large number of Briggs employees are shareholders, a liquidation in which equity security holders generally receive little or nothing, liquidation would com-

pound the injury to the Briggs employee group as a whole.

I am impressed that employees have attempted to relieve Briggs financial problems by means other than consessions. A significant portion of employees voluntarily contributed 15% of their wages for one year to keep Briggs in business. They have also consistently supported Briggs efforts to raise capital through employee stock purchase programs. Given these facts, I think that the interests of the small group of employees currently employed by Briggs are outweighed by the concerns of the larger group of all Briggs employees as well as the interests of the debtors and its other creditors.

Briggs' rejection of its collective bargaining agreements will not impose undue hardships on even the current employees of Briggs. Although I am certain that these employees will suffer some reduction in compensation and benefits, Briggs will not be able to unilaterally determine the amount of wages to be paid or impose unreasonable terms and conditions on its employees. As the court in *Bildisco* pointed out, "the debtor-in-possession is not relieved of all obligations under the NLRA simply by filing a petition for bankruptcy. A debtor-in-possession is an 'employer' within the terms of the NLRA, 29 U.S.C. § 152(1) and (2), and is obligated to bargain with employees certified representatives over the terms of a new contract ... following formal approval of rejection by the Bankruptcy Court." *Id.* at ——, 104 S.Ct. at 1200. *See NLRB v. Burns Security Services, Inc.,* 406 U.S. 272, 281, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972). Such negotiations will be based on current economic conditions; the debtor's and the industry's.

Obviously the debtor who is forced out of existence in a liquidation does not benefit. Secured creditors may recover their collateral, however, they lose to the extent they are under secured, the cost of liquidating their collateral, the decrease in collateral value in liquidation versus that of a going concern and any return they hoped to get on their investment. As noted above, unsecured creditors, in the event of a liquidation, will receive less than the full value of their claims and equity security holders stand even less of a chance of receiving any significant return on their investments. Based on the foregoing, I do not think that any interests are served, save the short term interest of the current employees by not permitting rejection of the union contracts and subjecting the debtor to increased likelihood of liquidation.

## C

In *Bildisco*, the court added to the *Brada-Miller* standard a requirement that the Bankruptcy Court "be persuaded to that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution." *Id.* —— U.S. at ——, 104 S.Ct. at 1196. This requirement was added in recognition of the debtor-in-possession's duty to bargain with the union under § 8(a)(5) of the NLRA; 29 U.S.C. § 158(a)(5) as well as "the National Labor policies of avoiding economic strife and encouraging collective bargaining." *Id.* at ——, 104 S.Ct. at 1196. The court stated,

29 U.S.C. § 151 generally requires that employers and unions reach their own agreements on terms and conditions of employment free from government interference .... The Bankruptcy Court need step into this process only if the parties inability to reach an agreement threatens to impede the success of the debtor's reorganization. If the parties are unable to agree, a decision on rejection of the collective bargaining agreement may become necessary to the reorganization process. At such point, action by the Bankruptcy Court is required, while the policies of the Labor Act have been adequately served ....

*Id.* at ——, 104 S.Ct. at 1197.

The Court was careful to point out, however, that to meet this requirement the Bankruptcy Court need not determine that

the parties have bargained to an impasse.[7]

In this case, I think Briggs has made reasonable efforts to negotiate voluntary modifications to the collective bargaining agreements it now seeks to reject. They have initiated meetings with both the Teamsters National and various local unions. Briggs, at my insistence, attempted to initiate some negotiations even after the conclusion of the hearings on this motion. To date these efforts have not been productive. Considering the substantial time which has elapsed since the filing of Briggs Bankruptcy petition, their motion to reject its collective bargaining agreements, the burdensome nature of the contracts and the apparent inability to reach any agreement to modify the contracts voluntarily, I think it is clear the parties inability to reach an agreement threatens to impede the successful reorganization of this debtor.

### D

While I am not certain the court intended to add a fourth requirement to the *Bildisco* test, the dicta in *Bildisco* implies that the Bankruptcy Court must determine before permitting the rejection of collective bargaining agreements that the Chapter 11 policy of permitting successful rehabilitation of the debtors is served by allowing the rejection. *Id.* at ——, 104 S.Ct. at 1197. While the *Bildisco* court may have intended this merely as a limitation to prevent the Bankruptcy Court from engaging in "free-wheeling consideration of every conceivable equity" when balancing the equities in the second part of the test, I think it is prudent to discuss this requirement, if indeed it is a requirement, as it relates to this case.

The hazard of this requirement is that it could easily be construed as requiring a finding that rejection is necessary to a successful reorganization. However, since the court in *Bildisco*, specifically rejected that stringent requirement of *REA Express* as being "fundamentally at odds with the policies of flexibility and equity built into a Chapter 11." I am confident that this requirement imposes some lesser test. I believe the appropriate requirement is that the Bankruptcy Court find that the rejection of the collective bargaining agreements increases the probability that the debtor will be able to reorganize.

Based on the foregoing discussions regarding the burdensomeness of the unmodified collective bargaining agreements on the debtor's estate; the debtor's apparent inability to otherwise reduce its operating costs or increase revenues and reverse its pattern of deficit administration, relief from the major portion of the debtor's operating costs represented by its labor costs, will increase the probability that the debtor will be able to be successfully rehabilitated. Therefore, in this case, I find the rejection of the collective bargaining agreements comports with the policies underlying Chapter 11.

Based on the foregoing, I am persuaded that the collective bargaining agreements to which Briggs is a party are burdensome to the estate in both direct and indirect labor costs. Although rejection will result in the reduction in compensation of current employees, the consequent reduction in labor costs substantially improves the probability that Briggs will be able to successfully reorganize. Reorganization will benefit Briggs' employees through continued em-

---

7. *See NLRB v. Bildisco,* —— U.S. ——, —— ——, 104 S.Ct. 1188, 1200–1201, 79 L.Ed.2d 482. The requirement to negotiate to an impasse under § 8(a)(5) and 8(a) of the NLRA before an employer may reject its collective bargaining agreement is specifically rejected by the court in *Bildisco* when deciding whether a debtor-in-possession commits an unfair labor practice by unilaterally rejecting or modifying its collective bargaining agreements without obtaining prior approval of the Bankruptcy Court.

In *Bildisco* the court stated,
> Whether impasse has been reached generally is a judgment call for the Board to make; imposing such a requirement as a condition precedent to rejection of the labor contract simply diverts the Bankruptcy Court from its customary area of expertise to a field in which it presumably has little or none.

*Id.* at —— ——, 104 S.Ct. at 1200–1201.

ployment as well as improve the chances of other interested parties receiving a return on their claims and investments.

Without rejection, there is a strong likelihood that Briggs will liquidate, if not immediately at some point in the future. I am convinced that Briggs has made a reasonable effort to obtain voluntary modifications of their collective bargaining agreements. Although I cannot (and need not) determine that the parties have bargained to an "impasse", I believe the parties inability to reach an agreement threatens to impede the success of the debtor's reorganization.

Finally, after balancing the various interests involved and considering both the relative degree and qualitative difference in the hardships each will face upon rejection, I believe permitting Briggs to reject its collective bargaining agreements comports with the Chapter 11 policy of permitting successful rehabilitation of debtors.

THEREFORE, IT IS ORDERED:

The debtor's rejection of its collective bargaining agreements is approved.